ACCEPTED
03-13-00370-CV
5888749
THIRD COURT OF APPEALS
AUSTIN, TEXAS
6/30/2015 4:42:41 PM
JEFFREY D. KYLE
CLERK

CASE NO. 03-13-00370-CV

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
6/30/2015 4:42:41 PM
JEFFREY D. KYLE
Clerk

STATE BOARD FOR EDUCATOR CERTIFICATION and
MICHAEL BERRY, THE ACTING CHIEF EXECUTIVE OFFICER OF
THE STATE BOARD FOR EDUCATOR CERTIFICATION, IN HIS OFFICIAL
CAPACITY ONLY,

*Appellant*

v.

ERASMO MONTALVO,

*Appellee*

On Appeal from the 200th Judicial District Court of Travis County, Texas; Cause
No. D-1-GN-12-002991; Before the Honorable Tim Sulak

APPELLEE'S BRIEF

MARK W. ROBINETT
BRIM, ARNETT & ROBINETT, P.C.
2525 Wallingwood Drive, Building 14
Austin, Texas 78746
(512) 328-0048
(512) 328-4814 (facsimile)
e-mail: mrobinett@brimarnett.com

Oral Argument Requested          Attorneys for Appellee

# TABLE OF CONTENTS

STATEMENT CONCERNING ORAL ARGUMENT ............................................. 1

STATEMENT OF FACTS ....................................................................... 3

SUMMARY OF THE ARGUMENT ......................................................... 9

ISSUE I.:   The trial court correctly held that the Agency's decision to revoke Mr. Montalvo's teaching certificate was not supported by substantial evidence. ......... 11

   A.  Although the Board has the authority to issue sanctions for Code of Ethics violations, the Board is not entitled to revoke teaching certificates in the absence of actual wrongdoing ......................................................................... 11

      1.  The word "unworthy" does not give notice that the conduct in Mr. Montalvo has actually been found to have engaged, is proscribed. ................. 13

      2.  The Code of Ethics has been adopted since the *Marrs* case ..................... 23

   B.  The Agency has failed to show that Mr. Montalvo's actions, which it admits are not violations of the Code of Ethics, somehow make him "unworthy to instruct" ............................................................................................. 29

ISSUE II.: The Agency's changes fly in the face of the Findings of Fact it adopted as its own ............................................................................................. 31

ISSUE III.:  Board's application of the "unworthy to instruct" "standard" is arbitrary and capricious and not supported by substantial evidence even if the language is constitutional on its face. ........................................................... 36

   A.  The meaning and history of "unworthy to instruct." ...................................... 36

      1.  The "unworthy to instruct language" was repealed by the legislature in 1995 ................................................................................................ 36

      2.  The "unworthy to instruct" language has never been held to be applicable to actions that did not clearly make an individual "unworthy to instruct." ...... 37

   B.  If "unworthy to instruct" applies to anyone, it is not Mr. Montalvo. ............ 38

ISSUE IV.: The trial court exercised its discretion properly and responsibly in issuing a permanent injunction ............................................................. 40

CONCLUSION ....................................................................................... 41

PRAYER .............................................................................................. 42

# INDEX OF AUTHORITIES

## CASES

*Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294 (1972).................. 14, 31

*Marrs v. Matthews*, 270 SW 586
(Tex. Civ. App.—Texarkana 1925, writ ref'd)........................... 11, 12, 13, 23, 38

*Texas Dept. of Pub. Safety v. Chavez*, 981 S.W.2d 449
(Tex. App. 1998) ...................................................................................... 14

*Shivers v. Liberty ISD*, No. 163-R3-682, p. 14 (Comm. Educ., Jan. 1985)............ 34

*Whalen v. Rock Springs* ISD, No. 065-R1B-284 Comm'r Education. 1985),
*1985* TX Educ. Agency LEXIS 61, *11985, at *17 ...................................... 34, 35

## STATUTES

19 Tex. Admin Code §247.2(b)(3)(B), (E), and (F) .................................. 27, 28, 38

19 Tex. Admin. Code §249.3(51) ............................................................ 19

19 Tex. Admin. Code §249.15(b)(2)........................................................... 6

24 Tex. Reg. 2308 (March 26, 1999) ...................................................... 24

Texas Education Code §13.046........................................................... 24

Texas Education Code §13.203........................................................... 23

## STATEMENT CONCERNING ORAL ARGUMENT

Erasmo Montalvo, Appellee, requests an opportunity to present Oral Argument if the Appellant's Request for Oral Argument is granted.

CASE NO. 03-13-00370-CV

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN

STATE BOARD FOR EDUCATOR CERTIFICATION and MICHAEL BERRY,
THE ACTING CHIEF EXECUTIVE OFFICER OF THE STATE BOARD FOR
EDUCATOR CERTIFICATION, IN HIS OFFICIAL
CAPACITY ONLY,
Appellant

v.

ERASMO MONTALVO,
Appellee

On Appeal from the 200th Judicial District Court of Travis County, Texas;

Cause No. D-1-GN-12-002991; Before the Honorable Tim Sulak

APPELLEE'S BRIEF

TO THE HONORABLE THIRD COURT OF APPEALS:

This case demonstrates why we have judicial review of administrative decisions. It is fundamental that courts are not allowed to second guess administrative agencies in matters entrusted to the agency's expertise. Indeed, the

statutes and case law make clear that the courts must affirm an agency's decision as long as it is supported by substantial (i.e., a minimal amount of) evidence and is reasonable (i.e., not arbitrary and capricious). The reviewing court is not allowed to substitute its judgment for the agency's, even if the court would have made a different decision.

However, there are times when an agency's action is not reasonable. There are times when an agency ignores the facts and the evidence. There are times when an agency makes whimsical decisions based on emotion rather than logic. In those cases, the courts are authorized to tell the agency that it has gone too far, that its decision cannot stand, that there are limits to its discretion.

This is that case.

What's more, it is good for the agency to know there are limits, that its decisions must be carefully considered, based on evidence, and supported by findings of fact made by an objective fact finder.

## STATEMENT OF FACTS

1.    Student V.S. was a senior at Rio Grande City High School in the spring of 2008 who participated in track. Her coach was Erasmo Montalvo, the Appellee in this case.

2.     V.S. graduated that spring.  After she graduated, in late May or early June, she participated in a video concerning her track accomplishments with Mr. Montalvo.  The video was arranged by Mr. Montalvo at the request of V.S.'s father to get her some media coverage.  (SOAH Transcript: 763:6-764:17; 766:18-24; Respondent's Exh. 23.)

3.     In the video, V.S. interacts with Mr. Montalvo in a carefree, adoring, casual, and "giddy" (the term used by Mr. Villarreal, the moderator) manner.  As the Administrative Law Judge at State Office of Administrative Hearings characterized her conduct, she "appears happy and excited, and seems comfortable in Mr. Montalvo's presence."  (SBEC Appendix D, p. 42.)  She looked on Mr. Montalvo with a visage of admiration and appreciation.  In all respects, she appeared genuinely excited and happy to be with him.

When asked what was special about that moment, her response was: "Being here with my coach."

She even proudly wore the Corpus Christi Islander tee shirt (where she was going to attend college as a track athlete) Mr. Montalvo had purchased for her for this event.  (SOAH Transcript, p. 168: 24 through 169: 12.)

4.     V.S.'s attitude at this point was consistent with both her recent and subsequent interactions with Mr. Montalvo, which included:

- Seeking Mr. Montalvo out and asking him to have his picture taken with her at the Los Nuestros scholarship dinner in May 2008 (SOAH Transcript, p. 624: 21-626:12)

- Keeping a poster Mr. Montalvo had made about her during her sophomore year in her senior memory book (SOAH Transcript, p. 164, line 3 through 165: 25)

- Talking to him on the phone, including making calls to him herself (SOAH Transcript, p. 155: 7-9; 157: 12-18; Pet. Exh. 3)

- Attending a barbecue given by Mr. Montalvo at his house for fellow student/athlete A.G.'s birthday when A.G.'s father was sick (SOAH Transcript, p. 609:11-610: 11[testimony of A.G.])

- Volunteering to help Mr. Montalvo out with summer track and working with him in that regard (SOAH Transcript, p. 157:19 through 158:6; 623: 24 - 624: 20 [testimony of Principal Saenz]; 655: 9 - 656: 3 [testimony of Baldemar Garza]; 712: 1-21 [testimony of K.S.]; 721: 11-20 [testimony of A.B.]

5.    Several months later, S.V. accused Mr. Montalvo of raping her the previous April (2008). (See Appendix A, Paragraphs 18-19.)

6.    Mr. Montalvo was promptly arrested and indicted on two counts of an Improper Relationship Between Educator and Student. (See Appendix A, Par. 22.)

7.    A jury, apparently not believing V.S.'s testimony, found Mr. Montalvo Not Guilty on both counts. (See Appendix A, Par. 23.)

8.    The State Board for Educator Certification was not satisfied with this result. It decided to pursue its own charges against Mr. Montalvo designed to deprive Mr. Montalvo of his teaching certification. The Agency submitted a Petition to the

5

State Office of Administrative Hearings that contained the following allegations (Appendix A):

- That in or around the spring of 2008, Plaintiff had knowingly engaged in sexual intercourse with "Student 1," a person under the age of 18 years of age on numerous occasions. (Par. II-5)

- That in or around the spring of 2008, after Student 1 suffered a leg injury, he "took Student 1 to a bus and massaged her leg." (Par. II-6)

- That as the injury did not heal, he moved his hand "farther and farther up her leg" into her genital area. (Par. II-8)

- That during the spring of 2008, Student 1 and other female track athletes would go to his home to soak in his hot tub. (Par. II-9)

- On one occasion, when Student 1 was alone with him, he engaged in oral sex with her. (Par. II-10)

- Subsequently, he engaged in sexual relations with Student 1 in the field house. (Par. II-11)

- Continuing on through the spring of 2008, he would engage in inappropriate touching of Student 1. (Par. II-12)

- He told the student that he had to continue to massage her, because it was the only way she would perform well at upcoming track meets. (Par. II-13)

- He told the student that if she told the trainer she was injured, the trainer would not let her run in upcoming track meets. (Par. II-14)

- During the spring of 2008, there were approximately 480 phone calls between Plaintiff and the student, of which over 80 were after 10p.m.

9. The Agency contended in its Petition that its allegations against Plaintiff made Plaintiff unworthy to instruct or supervise the youth of this state in violation of 19 Tex. Admin. Code §249.15(b)(2), and that he violated the Educators' Code of Ethics as follows:

6

- Standard 1.7, by "failing to comply with state regulations, written school board policies, and other laws."

- Standard 3.2, by "knowingly treating a student in a manner that adversely affects the student's learning, physical health, mental health, or safety."

- Standard 3.5 by "engaging in physical mistreatment of a student."

- Standard 3.6, by "soliciting or engaging in sexual conduct or a romantic relationship with a student."

10. Following a hearing that went into a fourth day, the Administrative Law Judge issued a fifty-five page Proposal for Decision that carefully and meticulously rejected every reason proffered by the Agency as a basis for issuing sanctions against Mr. Montalvo's certification. The Administrative Law Judge, as had the jury in the criminal trial, did not find V.S.'s testimony credible. (Agency Appendix D.)

11. More specifically, the Administrative Law Judge made the following Findings of Fact:

- There is insufficient evidence to support a finding that the rub downs were sexual and involved inappropriate touching. (Finding No. 21)

- There is insufficient evidence to support a finding that Mr. Montalvo sexually abused or assaulted V.S. when she went to use the Jacuzzi. (Finding No. 24)

- There is insufficient evidence to support a finding that Mr. Montalvo sexually abused or assaulted V.S. in the field house. (Finding No. 25)

- The phone calls were about V.S.'s track performance and emotional issues. The calls did not relate to or constitute a sexual or romantic solicitation or relationship between Mr. Montalvo and V.S. (No. 27)

7

- There is insufficient evidence to support a finding of any inappropriate touching, or sexual or romantic solicitation or relationship, between Mr. Montalvo and V.S. (Finding No. 28)

- There is insufficient evidence to support a finding that Mr. Montalvo knowingly treated V.S. in a manner that adversely affected her learning, physical health, mental health, or safety. (Finding No. 29)

- There is insufficient evidence to support a finding that Mr. Montalvo intentionally, knowingly, or recklessly engaged in physical mistreatment, neglect, or abuse of V.S. (Finding No. 30)

12. The State Board for Educator Certification adopted all of these Findings of Fact. (Agency Appendix B.)

13. Notwithstanding the Board's adoption of these Findings of Fact, the Board acted to revoke Mr. Montalvo's teaching certification by changing the Administrative Law Judge's Conclusions of Law. In particular, the ALJ concluded that:

> The foregoing Findings of Fact do not support a conclusion that Mr. Montalvo is a person unworthy to instruct or supervise the youth of this state.

> (Conclusion of Law No. 7.)

The Board changed this Conclusion of Law to read:

> Based on Findings of Fact 11, 14, 18, 20, 22, 23 and 26, Respondent exceeded the bounds of the proper educator-student relationship and is a person unworthy to instruct or supervise the youth of this state.

(Agency Appendix B.)

14. It is undisputed that Plaintiff timely filed a Motion for Rehearing, which was overruled by Operation of Law on September 24, 2012.

8

15.   It is undisputed that Plaintiff filed suit for a Temporary Restraining Order, Temporary Injunction, and Permanent Injunction to enjoin the Agency from treating his certificate as being revoked.

16.   It is undisputed that the requested Temporary Restraining Order was granted on September 25, 2012.

17.   It is undisputed that the requested Temporary Injunction was granted on October 9, 2012.

18.   It is undisputed that the requested permanent injunction was granted on April 29, 2013. The Trial Court, in its Findings of Fact and Conclusions of Law, held that the Agency's decision revoking Mr. Montalvo's teaching certificate was arbitrary and capricious, not supported by substantial evidence, and characterized by a clearly unwarranted exercise of discretion.

## SUMMARY OF THE ARGUMENT

The Board adopted all of the Administrative Law Judge's Findings of Fact, including findings that rejected the Agency's claims that Mr. Montalvo had violated the Code of Ethics for Texas Educators.

Case closed.

Or it should have been closed. This case should have involved nothing more than the Board adopting the Findings of Fact made by the fact finder who actually

heard the testimony and assessed the witnesses' credibility, and moving on to its next case.

Instead, the Board took a few findings out of context, while ignoring findings that put them in context, in order to attempt to justify a decision that has since been met with skepticism or rejected by judge after judge after judge (i.e., a different District Court judge in each of the TRO, Temporary Injunction, and Permanent Injunction hearings).

The Agency's decision to revoke Mr. Montalvo's teaching certificate has no substance. It is not based on evidence or facts as found by the Administrative Law Judge and adopted by the Agency. It is not based on reason. It is the epitome of arbitrariness, capriciousness, and abuse of discretion.

In the absence of findings of any violations of the Educators' Code of Ethics, the Agency insists that it can deprive an educator of his career if, in its opinion, he exercises a lapse of judgment that does not have any adverse effect on anyone. That it can declare a teacher who makes what it considers a mistake, "unworthy to instruct or to supervise the youth of this state," even if he has been a successful teacher for more than twenty years; indeed, even if he has the trust of the school district that has employed him for more than twenty years, that knows him much better than the Agency ever will, and which wishes to exercise its judgment as a matter of local control to continue employing him.

The Agency's action to revoke Mr. Montalvo's certificate in the absence of any violation of the Code of Ethics or any finding of harm or intent to harm any student or anyone else is the epitome of arbitrariness and capriciousness, the lack of substantial evidence, and abuse of discretion.

## ISSUE I.:

### The trial court correctly held that the Agency's decision to revoke Mr. Montalvo's teaching certificate was not supported by substantial evidence.

A.    Although the Board has the authority to issue sanctions for Code of Ethics violations, the Board is not entitled to revoke teaching certificates in the absence of actual wrongdoing

The Agency relies heavily on *Marrs v. Matthews*, 270 SW 586 (Tex. Civ. App.—Texarkana 1925, writ ref'd). In that case, the court addressed the language of then Art. 2814, which provided that the state superintendent of schools was authorized "to cancel the certificate of any person who is unworthy to instruct the youth of the state." *Id.* at 587. That language, repealed by the legislature in 1995, was incorporated into the Agency's rules in 1999. (Agency Brief, p. 18; Appendix B [§45].)

In *Marrs*, what made the certificate holder "unworthy to instruct the youth of the state" was his participation in "a fraudulent scheme for issuing teachers' certificates at examinations conducted in Hopkins county." *Id.*

11

The issue facing the court was whether the statute was "sufficiently definite in stating what shall constitute a disqualification for holding a teacher's certificate." If it were, the sanction in that case would be valid. If not, the court mused that the trial court had correctly found in favor the teacher "notwithstanding the particular offense presented against the appellee might evidence an unworthiness to hold a teacher's certificate." *Id.*

The Court of Appeals held that the term "unworthy" was not impermissibly vague as to the conduct in that case (i.e., fraud in connection with teaching certificates). It did not conclude that the state superintendent could call any conduct he disagreed with "unworthy" and take away a teacher's certificate.

The Court discussed the concept of "unworthiness" as follows:

As here used, it means the lack of "worth"; the absence of those moral and mental qualities which are required to enable one to render the service essential to the accomplishment of the object which the law has in view. It may also include those positive traits of character which, notwithstanding excellent educational attainments, unfit one to impart proper instruction to the young. To call one "unworthy" is to impute moral delinquency to a degree of unfitness for the work in hand. There are many characteristics which may and should be considered in passing upon the issue of unworthiness in a teacher in the public schools. Different minds might reach different conclusions as to what qualities of character should render one unworthy to hold a certificate to teach. But there can be no difference of opinion about the fact that an unworthy person should not be permitted to teach in the public schools. What qualities, or lack of qualities, should render one unworthy would be difficult for legislative enumeration. They are so numerous, and their combinations so varied in different individuals, that a statute which undertakes to be more specific would either be incomplete, or

so inflexible as to defeat the ends sought. In the very nature of the subject there must be lodged somewhere a personal discretion for determining who are the "unworthy."

*Id.* at 588.

Worthy of repeating: "[T]here must be lodged somewhere a personal discretion for determining who are the unworthy."

On this, there is no disagreement.

However, there is a difference between "a personal discretion" and "unaccountability," a difference noted, in essence, by the Court:

Appeals may be taken from the ruling of the state superintendent to the state board of education. If the aggrieved party thinks he has been arbitrarily dealt with by this tribunal, he may appeal to the courts for relief.

*Id.* at 588.

This is precisely what we have in the present case: Mr. Montalvo thinks he has been dealt with arbitrarily by the Agency. The term "unworthy" does not and cannot be applied to him for the following reasons:

1. The word "unworthy" does not give notice that the conduct in Mr. Montalvo has actually been found to have engaged, is proscribed.

There can be no argument that the phrase "unworthy to instruct" is vague. As pointed out by the U.S. Supreme Court:

It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary

13

intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Grayned v. City of Rockford*, 408 U.S. 104, 108-09, 92 S.Ct. 2294, 2298-99 (1972). See also, *Texas Dept. of Pub. Safety v. Chavez*, 981 S.W.2d 449, 452 (Tex. App. 1998): "The standard rule is that a statute is unconstitutionally vague if the required course of conduct is stated in terms so vague that people of common intelligence must guess at what is required."

How does this square with the fact that the Texarkana Court of Appeals held in 1925 that the phrase "unworthy to instruct" was adequate notice that a teacher could lose his certificate if he "engaged in a fraudulent scheme for issuing teachers' certificates"?

How it squares is that certain acts are clearly within the concept of "unworthiness to teach the State's children." It should come as no surprise to anyone that a teacher who abuses children physically or sexually, who embezzles or steals money from a school district, or who fraudulently issues teachers' certificates comes within this phrase, notwithstanding the fact that it does not specifically mention these types of conduct. It is reasonable to conclude that a

14

person of ordinary intelligence would understand that these types of acts are so heinous that they prohibited, and, therefore, should act accordingly.

The question is whether the conduct cited by the Agency in this case falls into the "self-apparent" category, or whether it is conduct that is either (a) arguably not so extreme as to make one "unworthy to instruct," or (b) easily correctable (i.e., not so severe that a "word to the wise" to "stop doing that" is sufficient).

The Findings taken out of context and relied on by the Agency are the following:

(a) <u>Finding of Fact No. 11</u>: "District protocol required that injured students be sent to the trainer."

Failure to follow District protocol makes one "unworthy to instruct"? This is hardly self-apparent. There is a reason this Finding uses the word "protocol": the reason is that it was not a rule. It was not a policy. It might have been a guideline. It might be good practice. It might be a very good practice. But it was not a rule. It was not a policy. Rules are directives. A rule places people on notice that there may be negative consequences for the rule's violation.

Protocol? Not so much.

Nowhere in the Agency's Disciplinary Guidelines does it even suggest that the failure to follow a "protocol" crosses any lines between the educator and student, or in any way makes an individual "unworthy to instruct" and at risk of

15

losing his certification. Otherwise, it is unlikely that there would be a teacher in the state who is "worthy" to instruct.

In addition, Finding of Fact No. 12 indicates that the Assistant Coach told V.S. to go to the trainer, and Mr. Montalvo did not prevent or discourage her from doing so. And this does not even take into consideration Finding No. 29 that "[t]here is insufficient evidence to support a finding that Mr. Montalvo knowingly treated V.S. in a manner that adversely affected her learning, physical health, mental health, or safety."

(b) Finding of Fact No. 14: "V.S. did not visit the trainer about her injury."

There is nothing in this Finding that indicates that Mr. Montalvo crossed the educator-student line or engaged in any conduct or activity that would indicate that he is "unworthy" to instruct the youth of the State of Texas. As mentioned above, V.S. was told to go to the trainer by the Assistant Coach, Mr. Montalvo did nothing to prevent or discourage her from doing so, and she simply decided not to go. In fact, the complete lack of logic in using this Finding to support its claim that Mr. Montalvo lacks "worth," undermines the Agency's entire rationale: it is the essence of "grasping at straws."

(c) Findings of Fact Nos. 18, 20, 22, and 23:

> 18. Following her injury, V.S. underwent stretching, rub downs, ice baths, and whirlpool use under Mr. Montalvo's direction.

16

20.    Mr. Montalvo gave V.S., and other students rub downs.

22.    On two or three occasions, student athletes visited Mr. Montalvo's home to use his Jacuzzi in the master bath. The athletes wore sports bras or bathing suit tops, and brief "bikers" shorts.

23.    On one occasion, V.S. went alone to Mr. Montalvo's house to use the Jacuzzi.

These situations might be problematic if accompanied by findings that something—anything—improper occurred on any of these occasions. However, there are no such findings. The Administrative Law Judge heard and considered all of the evidence and found that there was insufficient evidence that the rub downs were sexual in nature, that there was any romantic solicitation or relationship between Mr. Montalvo and V.S., or that he engaged in any conduct that adversely affected her in any way or that could be characterized as mistreatment, neglect, or abuse.

As for rubbing down athletes, the testimony was that there were no guidelines or policies concerning that matter. (SOAH Transcript: 234: 17-23; 246: 4-7).

It is true that the coaches were counseled not to be alone with an athlete. (SOAH Transcript 233: 16). But this was not a rule. It was probably a good idea, but not because being alone with an athlete is per se improper, immoral, or unethical. It was because of "the way it's going to appear to other people" (SOAH

17

Transcript: 233: 18; 243: 13-245:8), like members of an Agency who were not present at the hearing and not in a position to assess whether anything improper actually occurred, and who might have a knee-jerk reaction to a random piece of information devoid of all context.

In short, the Agency appears to be inclined to think the worst of teachers and wants to punish them for "crossing the line" even when there is no evidence that the line was crossed, no evidence that any conduct by the teacher was intended to harm any student, and no evidence that the teacher's conduct actually resulted in any harm. But that inclination is different from having a factual basis for concluding that a teacher is "unworthy to instruct" the youth of the State.

In short, nothing in the phrase "unworthy to instruct" places a teacher on notice that he will be in danger of losing his certification if, in his position as a coach, he gives students rubdowns, assists them in stretching, allows them to use his personal Jacuzzi when the district's is out of order, and sees them in biker shorts. This would be a different story if the teacher were to actually engage in improper conduct on any of these occasions; however, the Findings of Fact adopted by the Board clearly hold that nothing improper happened.

(d) Finding of Fact No. 26: "From February through June 2008, Mr. Montalvo engaged in approximately 480 phone calls with Student 1, with over 80 of the calls placed after 10:00 p.m."

The Agency has actually adopted guidelines to which this Finding is relevant—guidelines that defeat its own argument. In 2011, the Agency adopted Tex. Admin. Code 19 §249.3(50) (now §51) concerning "Solicitation of a romantic relationship." Subsection (A) provides that factors which may be considered "in determining the romantic intent of such communications or behavior, include, without limitation":

(i)   the nature of the communications;
(ii)  the timing of the communications;
(iii) the extent of the communications;

*******************

(vii) any other evidence tending to show the context of the communications between the educator and student.

Factors (i) and (vii) are not at issue in this case, leaving only the timing and "extent" of the calls to take into account in determining whether Mr. Montalvo is "unworthy to instruct."

The educators who testified at the hearing testified that although 480 calls during a five month period, including eighty after 10:00p.m., might appear to be excessive, the important aspect was what the calls actually concerned. (See SOAH transcript for testimony of Ricardo Saenz, Mr. Montalvo's principal, at p. 643,

19

lines through 644:3; 647: 14-649: 4; and testimony of the Rio Grande City ISD superintendent at page 873, lines 3-12. )

After assessing the testimony of the parties, including Mr. Montalvo's accuser, the ALJ found that nothing improper was discussed during those calls that might pertain to the solicitation of a romantic relationship. She made, therefore, Finding of Fact No. 27:

> The phone calls were about V.S.'s track performance and emotional issues. The calls did not relate to or constitute a sexual or romantic solicitation or relationship between Mr. Montalvo and V.S.

The Agency has wisely adopted no rule that simply states that X number of calls between a teacher and student crosses a line. Whatever number X might be, whether 1, 10, 20, 300, or 1,000, would be arbitrary. The same is true for the timing of the calls.

Instead, the Agency has included the number of calls and their timing as factors to be taken into consideration--not in a vacuum, but in conjunction with other factors, including the nature or substance of the calls.

To the extent the number of calls, by itself, is even relevant to anything, the 480 calls referenced included 162 from the student (SOAH Transcript: Agency Exh. 2A) to Mr. Montalvo. Further, approximately 301 of the calls (Exh. 2A has some entries that are difficult to read) were one minute or less in duration, and 37

20

more were two minutes or less. In fact, a large number of the calls "lasted" zero seconds.

In short, the ALJ followed the Agency's guidelines to a tee. That is, in essence, what the Agency objects to. The ALJ took all factors that the Agency considers relevant to the situation and actually took them into consideration.

If the Agency wants to establish a certain number of calls between a teacher and a student as "crossing the line," it can certainly do so. Then, at least, teachers would be on notice of the conduct for which they might be disciplined. If the number were fifteen, they could stop at fourteen. If 300, they could stop at 299. If one, they could refrain altogether. If that is what the Agency wants, then it should do it.

But there is no rational basis, in the absence of a bright line rule, for recoiling in horror and punishing a good teacher because he did not guess what number of calls or their timing might result in punitive action even in the absence of any dishonorable intent and in the absence of any adverse effect on a student.

Indeed, this is consistent with comments made by Merle Dover, one of the Agency's attorneys, at the University of Texas School Law Seminar on March 4, 2011, as to the relevance of the number and timing of phone calls and other electronic communications:

> It's really to put the educator on notice that in many of our cases, the text messaging becomes circumstantial evidence of the sanctionable conduct.

And the amount comes into consideration during those cases because if you have a situation where there are 10,000 text messages between an educator and a student, and the majority of those are occurring after midnight, this is going to be circumstantial evidence that perhaps those communications aren't about homework or what's going on in class and that there is an inappropriate relationship taking place.

*So we can't give a bright line number. What we do have is the number of times and length of the communication. And I think educators to be on notice that they will be considered.*

We find out about these cases because there has been a complaint of an inappropriate relationship. And when you only have the student and the teacher as the only two people who really know what went on between them, we look to these text communications and the phone records as circumstantial evidence.

(Emphasis added.)

Ms. Dover's comments in this regard make sense. It clarifies the proper and reasonable use of information concerning the number and timing of phone calls between teacher and student: as a reason to look into the situation to see whether there is an improper relationship. It is okay to be suspicious. What is not okay is to use just this information, in a vacuum, removing it from all context. What is not okay is to ignore information that negates the inference you want to draw. This is especially true when a hearing has been held, testimony has been received, and the fact finder has made specific fact findings rejecting the knee-jerk conclusion that something inappropriate must be going on.

In conclusion, the term "unworthy to instruct" is not sufficient to place a teacher on notice that talking on the phone to a student a certain number of times

22

and at certain times of day, could result in loss of his teaching certificate in the absence of any other information. Not when the Agency has conceded that the number and times of the conversations are merely information to be "considered," not bright line litmus tests.

In sum, the Administrative Law Judge considered all of the information related to the phone calls and rejected the Agency's position. There is no rational or logical basis, supported by the evidence or the facts, to conclude that they make Mr. Montalvo "unworthy to instruct" the youth of the State.

2.      <u>The Code of Ethics has been adopted since the *Marrs* case</u>

The *Marrs* decision was issued in 1925. The phrase "unworthy to instruct" was all the state superintendent had to work with at that time. As mentioned previously, that phrase was useful as applied to obvious and inarguable misconduct.

In 1971, the legislature created the Professional Practices Commission as §13.203 of the Education Code. (Acts 1971, 62nd Leg., p. 1854, ch. 735, §2.156.) See Appendix D.

Part of the PPC's charge, as found in §13.210, was as follows:

(a)     After public hearings at which associations and individuals representing the teaching profession and other interested persons shall have full opportunity to submit and request adoption of all or of part of the provisions of unofficial codes of ethics that have been adopted by state and national associations of members of the teaching profession, and to support, oppose, or request amendments to proposal, the commission shall develop

23

and adopt a "code of ethics and standard practices" which shall regulate and govern the conduct of the profession, parents, students, and the community.

Section 13.211 provided that:

A violation of any rule of the code of ethics and standard practices. . .shall be deemed to be "unprofessional practice," which shall be grounds for suspension or revocation of the teaching certificate of the member, which grounds shall be in addition to those specified in Section 13.046 of this code; or the member may be warned or reprimanded for such violation, if in the judgment of the commissioner of education the violation is not of sufficient gravity to require suspension or revocation of the teaching certificate.

Section 13.046 (Appendix E) included a provision authorizing the commissioner to suspend or cancel a certificate:

(1) On satisfactory evidence that the holder is conducting his school or his teaching activities in violation of the laws of this state;

(2) On satisfactory evidence that the holder is a person unworthy to instruct the youth of this state; or

(3) On complaint made. . .that the holder of the certificate [has abandoned his contract with a school district].

The Agency cites §13.046 in its brief (at 18). It notes that this section was repealed in 1995, when the legislature removed the PPC from under the Commissioner of Education and State Board of Education, and replaced it with a new agency (the current State Board for Educator Certification).

The upshot all this is that the term "unworthy to instruct" was, as of 1995, no longer a statutory term. It was not until years later that it resurfaced as one of the new Agency's rules at 24 Tex. Reg. 2308 (March 26, 1999), where it was defined as follows:

24

(45) Unworthy to instruct or to supervise the youth of this state--the determination that a person is unfit to hold a certificate under Subchapter B, Chapter 21, of the Act or to be allowed on a school campus under the auspices of an educator preparation program.

In effect at all times pertinent to the present case, the 2007 definition was identical (See Agency's Appendix F):

(45) Unworthy to instruct or to supervise the youth of this state--the determination that a person is unfit to hold a certificate under the TEC, Chapter 21, Subchapter B, or to be allowed on a school campus under the auspices of an educator preparation program.

Nothing there places a teacher on notice that the findings taken out of context by the Agency in this case could lead to the loss of one's certificate. If this language has any substance at all, it must be restricted to egregious cases such as fraudulently issuing teaching certificates. Except that there is probably not an egregious case that the Code of Ethics fails to cover—which is a major difference between the usage of the term "unworthy to instruct" in a statute in 1925 and its use as a supplement to an extensive Code of Ethics in the 21st Century.

This is not to say that the Code of Ethics is perfect. It is not. However, it does a much better job at placing educators on notice as to what is sanctionable conduct and what is not. Although it cannot list every specific fact situation that could land an educator in "hot water," it does provide more guidance, more clarity, and less guesswork to those in the teaching profession.

The specific provisions of the Code of Ethics relied on by the Agency in this case were:

- Standard 1.7, by "failing to comply with state regulations, written school board policies, and other laws."

- Standard 3.2, by "knowingly treating a student in a manner that adversely affects the student's learning, physical health, mental health, or safety."

- Standard 3.5 by "engaging in physical mistreatment of a student."

- Standard 3.6, by "soliciting or engaging in sexual conduct or a romantic relationship with a student."

There was no evidence of failing to comply with any state regulations, written school board policies, or other laws. Standards 3.2, 3.5, and 3.6 were all specifically rejected by the Administrative Law Judge (as well as by the Agency itself in adopting the ALJ's Findings of Fact and Conclusions of Law 1-6):

Finding of Fact No. 21: "There is insufficient evidence to support a finding that the rub downs were sexual and involved inappropriate touching."

Finding of Fact No. 24: "There is insufficient evidence to support a finding that Mr. Montalvo sexually abused or assaulted V.S. when she went to use the Jacuzzi."

Finding of Fact No. 25: "There is insufficient evidence to support a finding that Mr. Montalvo sexually abused or assaulted V.S. in the field house."

Finding of Fact No. 27: "the phone calls were about V.S.'s track performance and emotional issues. The calls did not relate to or constitute a sexual or romantic solicitation or relationship between Mr. Montalvo and V.S."

26

Finding of Fact No. 28: "There is insufficient evidence to support a finding of any inappropriate touching, or sexual or romantic solicitation or relationship, between Mr. Montalvo and V.S."

Finding of Fact No. 29: "There is insufficient evidence to support a finding that Mr. Montalvo knowingly treated V.S. in a manner that adversely affected her learning, physical health, mental health, or safety.

Finding of Fact No. 30: "There is insufficient evidence to support a finding that Mr. Montalvo intentionally, knowingly, or recklessly engaged in physical mistreatment, neglect, or abuse of V.S.

Conclusion of Law No. 6: "The foregoing Findings of Fact do not support conclusions that Mr. Montalvo violated Standards 3.2, 3.5 or 3.6 of the Educators' Code of Ethics. 19 Tex. Administrator. Code §247.2(b)(3)(B), (E), and (F) [now §247.2(3)(B), (E), and (F)]."

This does not mean that there might not be a situation that would fall outside of the Educators' Code of Ethics that would make a teacher "unworthy to instruct." However, the provision concerning teacher-student interactions is extensive. At all times pertinent to the present case, the provisions related to Ethical conduct toward students, read as follows (Appendix G):

Ethical Conduct Toward Students.

(A) Standard 3.1. The educator shall not reveal confidential information concerning students unless disclosure serves lawful professional purposes or is required by law.

(B) Standard 3.2. The educator shall not knowingly treat a student in a manner that adversely affects the student's learning, physical health, mental health, or safety.

(C) Standard 3.3. The educator shall not deliberately or knowingly misrepresent facts regarding a student.

27

(D) Standard 3.4. The educator shall not exclude a student from participation in a program, deny benefits to a student, or grant an advantage to a student on the basis of race, color, sex, disability, national origin, religion, or family status.

(E) Standard 3.5. The educator shall not engage in physical mistreatment of a student.

(F) Standard 3.6. The educator shall not solicit or engage in sexual conduct or a romantic relationship with a student.

(G) Standard 3.7. The educator shall not furnish alcohol or illegal/unauthorized drugs to any student or knowingly allow any student to consume alcohol or illegal/unauthorized drugs in the presence of the educator.

These are what the Agency calls its "enforceable standards." 19 Tex. Admin. Code §247.2. They include, as Standard 3.2, a provision that "[t]he educator shall not knowingly treat a student in a manner that adversely affects the student's learning, physical health, mental health, or safety." The ALJ specifically found that Mr. Montalvo did not treat the student in question in a way that was adverse to her learning, physical health, mental health, or safety."

Not even with respect to talking to her on the phone.

In conclusion, when put in the context of all of the Findings made by the Administrative Law Judge and adopted by the Agency, as well as the specific findings that none of the alleged Code of Ethics violations occurred, the phrase "unworthy to instruct," cannot be held to have any applicability to the present case.

28

B.   The Agency has failed to show that Mr. Montalvo's actions, which it admits are not violations of the Code of Ethics, somehow make him "unworthy to instruct"

As mentioned previously, it might be possible for an individual to be "unworthy to instruct" while having complied with the Code of Ethics, but Appellee will leave it to the Agency to come up with hypotheticals that fit into that category.

This case, however, does not deal with hypotheticals; it deals with reality. And nothing that Mr. Montalvo has been found to have done qualifies for the "Ethical but still somehow Unworthy" designation.

What the Agency contends makes him "unworthy to instruct," even in the absence of any finding of a violation of the Code of Ethics, and even with the Agency's relatively meaningless and circular definition of "unworthy" ("the determination that a person is unfit to hold a certificate under the TEC, Chapter 21, Subchapter B, or to be allowed on a school campus under the auspices of an educator preparation program") are the following (Agency Brief, p. 22):

(a)   Although nothing untoward happened when V.S went to Mr. Montalvo's house to use the Jacuzzi, he *allowed* her to do so;

(b)   Although the phone calls were not of an improper nature, and the number, pursuant to the Board's own rules, is simply one piece of information to be considered in determining whether something improper was going on, the number of calls, in and of itself, makes him "unworthy to instruct."

29

The Agency contends, on page 11 of its brief, that it is "reasonable for the Board to be concerned about hundreds of phone calls having taken place during a four-month period between VS and Montalvo."

Indeed, it is. This information justifies being concerned. It justifies being suspicious. It justifies looking into the matter and investigating it to determine if actual wrongdoing was taking place.

Well, the Agency investigated. It requested a hearing before SOAH. It presented its evidence before a trained and impartial fact finder. A fact finder who found that no wrongdoing had occurred—a fact the Agency actually adopted as Finding of Fact 27:

> Finding of Fact No. 27: "the phone calls were about V.S.'s track performance and emotional issues. The calls did not relate to or constitute a sexual or romantic solicitation or relationship between Mr. Montalvo and V.S."

Once mere suspicions are found to be unfounded, the question becomes: What, precisely, did Mr. Montalvo do that falls within the catch-all "unworthy to instruct" language? What is it, in spite of the fact that nothing he did was found to have been of ill-intent or had an adverse effect on the student in question, that makes him a person who is not worthy to instruct the youth of the state of Texas?

The answer is: "Nothing."

The Agency is obviously bothered by a certain unspecified number of phone calls made at certain unspecified times of day, for certain unspecified lengths; and rub downs of female students by a male coach apparently make it squeamish (despite evidence at hearing that this is not unusual). If it wants to outlaw conduct that it finds personally offensive, it has the power to do it.

What the Agency cannot do, and should not be allowed to do, is hide behind the assertion that it can't possibly list everything that makes one unworthy to instruct"—not when its own position is that the number of calls per se does not make one "unworthy," but, instead, is only a factor that may be considered in determining whether something improper is going on.

What the Board does not have the power to do, as a matter of due process, is adopt the phrase "unworthy to instruct" in a regulation and decide later what it means, making it an entirely subjective concept, "with the attendant dangers of arbitrary and discriminatory application"--especially if what it later decides is not reasonably self-apparent to a teacher of common intelligence. See *Grayned*, 408 U.S. 104, 108-09, 92 S. Ct. 2294, 2298-99, 33 L. Ed. 2d 222 (1972).

## ISSUE II.

### The Agency's changes fly in the face of the Findings of Fact it adopted as its own

31

The Agency acknowledges that it adopted all of the ALJ's Findings of Fact, as well as the first six Conclusions of Law, which specifically shoot down all of its allegations that the Code of Ethics was violated.

As mentioned previously, it is conceivable that conduct that does not offend the Code of Ethics could fall within the "unworthy to instruct" category (assuming, for the sake of discussion, that "unworthy to instruct" is a valid construct). However, the Agency fails to show how the facts in this case justify a conclusion to that effect.

Instead, the Agency argues that Mr. Montalvo's actions demonstrate "poor judgment." (Agency Brief at 9-10.) It notes that even "the ALJ found at least two of his decisions to be of questionable judgment and a cause for concern."

The issue of "cause for concern" has been previously addressed. In short, "cause for concern" is not the same thing as "unworthy to instruct," and equating the two is the pinnacle of arbitrariness and capriciousness.

The Agency claims:

It is reasonable, given the Findings of Fact, for a state licensing board charged with regulating educator conduct in an effort to ensure the safety of schoolchildren, to find that Montalvo's judgment and subsequent actions placed those children at risk.

(Agency Brief at 9.)

This is where the Agency goes far afield from reasonable decision-making:

(a)     First, if the Agency thinks its charge is to sanction teachers who exercise poor judgement, it needs a staff many times larger than what it has. There is not a teacher alive, nor attorney, nor physician, nor anyone, who never exercises poor judgment in his or her daily or professional life.

(b)     If the standard for revoking a teacher's certificate is "poor judgment," the Agency needs to say so specifically by adopting a Standard to that effect (and then try to defend that standard as a matter of due process, reasonable notice of what is proscribed, or even a matter of logic).

(c)     The Appellee is unaware of a single case in which the Agency has ever revoked a teaching certificate for exercising poor judgement in the absence of some serious consequence flowing from it, and the Agency did not offer one at the SOAH hearing and has not done so at any point in the proceedings in District Court or this appeal.

(d)     The issue of judgment is a matter best left to the employing school district. If a teacher exercises poor judgment, it is not the task of the Agency to prohibit all school districts throughout Texas from employing an individual. "Poor judgment" means different things to

33

different people, and specific instances are more important to some school districts and administrators than others. Some might find that what others consider poor judgment is not poor judgment at all, or that the teacher's attributes as someone who reaches and inspires students to be their best overrides an occasional lapse of judgment.

Unless a lapse of judgment is so severe that it cannot be corrected or remediated by counseling, directives, or reprimands, exercising poor judgment is not even cause for terminating a teacher's employment with a school district, let alone grounds to revoke the teacher's certification and prohibit all districts from employing that teacher. The Commissioner of Education, the highest ranking education official in Texas, has noted:

> one instance of exercising **poor judgment** will not necessarily support an action of **termination** of employment. See e.g., *Shivers v. Liberty ISD*, No. 163-R3-682, p. 14 (Comm. Educ., Jan. 1985). In most instances, the best way to handle such matters is to advise the teacher that he or she has exercised **poor judgment** and that a recurrence of the objectionable conduct might result in the teacher's **termination**. In the present case, there is no reason to believe that a stern warning to that effect would not have effectively prevented a recurrence of the conduct.

*Whalen v. Rock Springs* ISD, No. 065-R1B-284 Comm'r Education. 1985), 1985 TX Educ. Agency LEXIS 61, *11985, at *17 (emphasis added).

In the *Whalen* case, the Commissioner, nevertheless, affirmed the termination because the local Board of Trustees had determined that the substance of the teacher's comments were harmful or potentially harmful to the students taking into account a number of factors, including the type of community the district served. The Commissioner felt that the Board was "closest to the situation, most familiar with the standards and expectations of the community in which the children affected reside." Id. at *15-16, 18.

The Commissioner noted, however:

   a. that any harm stemming from "poor judgment" must be *significant,* not minor, to support a termination (Id. at *18); and

   b. the factors unique to the discussion of the teacher's behavior in that case may be different in other cases due to the variety of community standards found in the 1100 plus school districts in Texas (Id.).

In summary, the Agency had a right to be "concerned." It had a right to investigate. It had a right to submit its concerns and the results of its investigation at a hearing. Even after those concerns were proven unfounded, it had the right to express those concerns to Mr. Montalvo and tell him that it disapproved of his judgment and to be careful not to do the same things in the future.

What the agency had no right to do was revoke Mr. Montalvo's teaching certificate for exercising "poor judgment" that was unaccompanied by any actual adverse consequence (even a minor one) to anyone or anything other than speculation that something bad might occur in the future; and to use its speculation to bar more than a thousand school districts in Texas from employing him, notwithstanding the fact that each district understands its own community, its own needs, and its own students far better than any single Agency.

## ISSUE III.

### The Board's application of the "unworthy to instruct" "standard" is arbitrary and capricious and not supported by substantial evidence even if the language is constitutional on its face

A.     The meaning and history of "unworthy to instruct."

　　　1.     The "unworthy to instruct language" was repealed by the legislature in 1995.

As noted previously, the legislature repealed the "unworthy to instruct" provision in 1995 when it created the State Board for Educator Certification. Unlike 1925, a Code of Ethics for educators had been adopted that gave much better guidance to educators about what conduct would be deemed improper than the state superintendent had to work with in 1925.

After four years in which the "unworthy to instruct language" was not present in statute or regulation in any form, the Agency added it as a regulation in 1999.

It can be argued whether this language, now that a comprehensive Code of Ethics had been established, added anything of substance. What should not be arguable is that nothing in the present case was outside the Code of Ethics and yet, still, somehow, within the purview of the catchall phrase "unworthy to instruct."

2. <u>The "unworthy to instruct" language has never been held to be applicable to actions that did not clearly make an individual "unworthy to instruct."</u>

Assuming, for the sake of discussion, that the "unworthy to instruct" language is today valid on its face as a regulation (as opposed to a repealed statute), it has only ever been upheld to the extent that it was applicable to the fraudulent issuance of teaching certificates. As addressed previously, any educator of common intelligence should be aware that this type of fraudulent activity with regard to teaching credentials would make one "unworthy" of holding a place of trust and importance in the educational community.

To the same extent, the "unworthy to instruct" language might still be valid when involving extreme and egregious conduct that is not now articulated in the Code of Ethics. The problems with relying on this proposition, however, are two-

37

fold: (a) what actions could possibly fit within this construct, and (b) the Findings of Fact as to Mr. Montalvo's conduct are not among them.

B.    If "unworthy to instruct" applies to anyone, it is not Mr. Montalvo.

As mentioned a number of times previously, the current Code of Ethics casts a wide shadow. It is difficult for even a creative person to come up with conduct that would not fit within the Code of Ethics yet somehow result in a conclusion that it made one "unworthy to instruct."

Take the conduct in *Marrs*, for example: fraudulently issuing bogus teaching certificates. That is now covered by Standards 1.1 and 1.7 (19 Tex. Admin. Code §247.2):

> (A) Standard 1.1. The educator shall not knowingly engage in deceptive practices regarding official policies of the school district or educational institution.

> (G) Standard 1.7. The educator shall comply with state regulations, written local school board policies, and other applicable state and federal laws.

The Code of Ethics standards concerning Ethical Conduct toward Students (Appendix G) were well thought out, thoroughly vetted, and comprehensive. To repeat what has been stated a number of times in this brief, what conduct could obviously make one "unworthy to instruct" that is not included in these standards?

If, and this is a major if, there is something that does meet the parameters of making one "unworthy to instruct" while not violating any of the standards in the Code of Ethics, it is something that does not exist in this case.

38

The Agency claims, on page 22, that Mr. Montalvo is "unworthy to instruct by 'crossing the bounds of an appropriate student-teacher relationship.'" It, again, claims that this was a "lack of judgment," which has been addressed previously.

Where the Agency goes off the rails is its assertion that:

[u]ltimately, whether or not improper conduct—conduct beyond the ALJ's Findings of Fact—took place is not the issue. Thus, *it does not matter* whether the content of the phone calls was romantic in nature. Stated another way, *it is immaterial whether the content of the phone calls implicated a Code of Ethics violation* for the Board to find that the conduct exceeded the bounds of an appropriate student-teacher relationship and thus at least implicates the standard of "unworthy to instruct."

(Emphasis added.)

Well, yes, Agency, it does matter whether something improper actually occurred prior to depriving a professional of his livelihood. Could there be an exception if a finding were made, based on evidence, that the educator's *intent* was to engage in or solicit an inappropriate relationship with a student?

Maybe. But that is not what we have in this case.

Speculation, which is all the Agency has after the rejection of its claims by the ALJ, is not the same thing as substantial evidence. And relying on sheer speculation is as arbitrary and capricious and abusive of discretion as anything could possibly be.

# ISSUE IV.

## The trial court exercised its discretion properly and responsibly in issuing a permanent injunction

There is no evidence that the trial court acted improperly or that it failed to weigh the equities. The trial court determined that the Agency's decision to revoke Mr. Montalvo's teaching certificate was not supported by substantial evidence and was arbitrary and capricious. Under these circumstances, the equities favoring the Agency were slight.

The trial court also heard undisputed testimony, at the Application for Permanent Injunction hearing (Reporter's Record: 18:24-21:11), that Mr. Montalvo:

- had taught in Rio Grande City Independent School District for 20 years;

- coached track for approximately eight years;

- had received consistently received exceeds expectations on his evaluations;

- had never had any negative feedback in the evaluation category concerning interactions and communications with students;

- was placed on leave with pay by the district when he was indicted for sexual assault; and

- was reinstated by the district when he was acquitted.

So, yes, the trial court did weigh the equities, including the fact that the school district that had employed him as a teacher for twenty years, and which

40

knew him as a person and educator by an exponential factor better than the Agency, trusted him with its students.

There simply were no equities favoring the Agency, unless demanding a pound of flesh while acting arbitrarily and capriciously and in spite of the evidence, rather than because of it, is somehow considered an equity.

## CONCLUSION

In conclusion, the State Board for Educator Certification has no facts on which to rest its claim that Mr. Montalvo is "unworthy to instruct" the children of Texas. Indeed, the Agency itself adopted Findings that rejected every one of its claims that Mr. Montalvo had violated the Educators' Code of Ethics.

The Agency is left to argue that, despite no violations of the Code of Ethics by Mr. Montalvo, his teaching certificate should be revoked because of the concept of "unworthy to instruct," which is no longer found in any statute and which has been virtually subsumed by an extensive Code of Ethics that appears to cover anything a teacher could do that would make one "unworthy to instruct."

To the extent that the "unworthy to instruct" language is an independent basis for revoking an educator's certificate, it must, to be constitutional, be applied only to those cases where a person of common intelligence would understand that his or her conduct clearly fits into that category—conduct such as fraudulently

41

issuing bogus teaching certificates that would undermine the public schools of the state of Texas. It cannot be applied to instances where the Agency claims that an educator used "poor judgement"—at least not in the absence of any harmful outcome or a finding that harm was intended.

It is time for this Agency to let go of this educator and let him benefit the children of the State of Texas as a teacher. It is not time to send a signal to all teachers in the State of Texas that every time they make a mistake in the exercise of their judgment that results in no harm to anyone, they will, nevertheless, be subject to losing their teaching certificate if the State Board for Educator Certification second guesses or overreacts to what they have done.

## PRAYER

Erasmo Montalvo, Appellee, respectfully requests that this Court affirm the Judgment of the trial court in all respects and deny all relief sought by Appellant, the State Board for Educator Certification.

BRIM, ARNETT & ROBINETT, P.C.
Attorneys at Law
2525 Wallingwood Drive
Building 14
Austin, Texas 78746
(512) 328-0048
(512) 328-4814 (facsimile)

BY:   */s/ Mark W. Robinett*
      MARK W. ROBINETT
      State Bar No. 17083600

I certify that this brief complies with Tex. R. App. P. 9

## **CERTIFICATE OF COMPLIANCE**

The word count is 9540. The word processing software used to prepare this filing and calculate the word count is Microsoft Word 2010.

*/s/ Mark W. Robinett*
MARK W. ROBINETT

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument was served via the Court's ECF system to Ellen M. Sameth, attorney for Appellant State Board for Educator Certification, this 29th day of June 2015.

*/s/ Mark W. Robinett*
MARK W. ROBINETT

43

# APPENDIX

A. Original Petition

B. Historical Rule for the Texas Administrative Code - 19 Texas Administrative Code §249.3

C. Texas Register - 19 Texas Administrative Code Rule §249.3 Texas Register

D. Excerpts from Education Code of: Professional Practices Commissions

E. Texas Education Code §13.046

F. Proposed Rules, December 11, 1998, 23 Tex. Reg 12615

G. Texas Administrative Code, 19 Texas Administrative Code Rule §247.2

H. Commissioner of Education Decision

# TAB A

Original Petition

| | | |
|---|---|---|
| TEXAS EDUCATION AGENCY, EDUCATOR CERTIFICATION AND STANDARDS DIVISION, Petitioner | § § § § § § § § § § | BEFORE THE STATE BOARD |
| V. | | FOR |
| ERASMO MONTALVO, JR., Respondent | | EDUCATOR CERTIFICATION |

## ORIGINAL PETITION

Pursuant to TEX. EDUC. CODE §21.035, the Texas Education Agency, Educator Certification and Standards Division ("Petitioner") on behalf of the State Board for Educator Certification ("the Board" or "SBEC") files this Petition against **ERASMO MONTALVO, JR.,** ("Respondent") based on alleged violations of Title 19, TEXAS ADMINISTRATIVE CODE ("TAC"), ch. 227 through 250, and in support thereof shows the following:

### I.
### LEGAL AUTHORITY AND JURISDICTION

1. Pursuant to TEX. EDUC. CODE §21.031 and §21.041(b), SBEC is a State Board conducting its duties under the authority of the laws of the State of Texas, and rules and regulations duly promulgated thereunder. Pursuant to TEX. EDUC. CODE §21.035, SBEC's administrative functions, including the enforcement of educator standards of conduct, are provided by the Texas Education Agency, Educator Certification and Standards Division, whose address is 1701 N. Congress Ave., 5th Floor, Austin, Texas 78701-1494.

2. Respondent is a natural person who at all times relevant to this proceeding has held an active Texas Educator Certificate. Therefore, SBEC has jurisdiction for the purposes of this proceeding as provided in 19 TAC §249.18. Respondent may be served with notice of all actions and proceedings relating to this case through Respondent's last known address in the Board records and his attorney of record:

**ERASMO MONTALVO, JR.**
**3461 Mockingbird Drive**
**Rio Grande City, Texas 78582**

**MARK W. ROBINETT**
**Brim, Arnett, Robinett, Conners & McCormick, P.C.**
**2525 Wallingwood Drive, Bldg. 14**
**Austin, Texas 78746**

3. Respondent is required to keep his address current under the terms of 19 TAC §230.431.

4. Pursuant to 19 TAC §249.15(a), Petitioner may take the following actions:

   (a) place restrictions on the issuance, renewal, or holding of a certificate, either indefinitely or for a set term;

   (b) issue an inscribed or non-inscribed reprimand;

   (c) suspend a certificate for a set term or issue a probated suspension for a set term;

   (d) revoke or cancel, which includes accepting the surrender of, a certificate without opportunity for reapplication for a set term or permanently; or

   (e) impose any additional conditions or restrictions upon a certificate that the SBEC deems necessary to facilitate the rehabilitation and professional development of the educator or to protect students, parents of students, school personnel, or school officials.

5. Pursuant to 19 TAC §249.15(b), Petitioner may order disciplinary action against a person or certificate over which Petitioner has jurisdiction upon a determination based on satisfactory evidence that:

   (a) the person has conducted school or education activities in violation of law;

   (b) the person is unworthy to instruct or to supervise the youth of this state;

   (c) the person has violated a provision of the Educators' Code of Ethics;

   (d) the person has failed to report or has hindered the reporting of child abuse or the known criminal history of an educator as required by law and 19 TAC §249.14;

   (e) the person has abandoned a contract in violation of the TEX. EDUC. CODE §21.105(c), §21.160(c), or §21.210(c);

   (f) the person has failed to cooperate with the Texas Education Agency (TEA) in an investigation;

   (g) the person has committed an act described in 19 TAC §249.12(b), §249.14(g), or §249.16(b); and/or

   (h) the person has violated the security or confidential integrity of a secure test by departing from the procedures established by the commissioner of education including, but not limited to, acts and omissions described in 19 TAC § 101.65.

6. Pursuant to 19 TAC §249.17(d), Petitioner must permanently revoke the teaching certificate of any educator or permanently deny the application of any applicant if, after a contested case hearing, it is determined that the educator or applicant:

   a. engaged in or solicited any sexual contact or romantic relationship with a student or minor, as defined in 19 TAC §249.14(m);

b.    possessed or distributed child pornography;

c.    was registered as a sex offender;

d.    committed criminal homicide;

e.    possessed without a prescription, transferred, sold, distributed, or conspired to possess without a prescription, transfer, sell, or distribute any controlled substance defined in the Texas Health and Safety Code, Chapter 481, on school property; or

f.    committed any offence described in TEC §21.058.

7.    Petitioner may order disciplinary action pursuant to its enforcement authority under 19 TAC §247, upon a determination based on satisfactory evidence that a person has violated a provision of the Educators' Code of Ethics.

## II.
## MATTERS ASSERTED

In support of this Original Petition and based on information and belief, Petitioner charges and alleges the following:

1.    **ERASMO MONTALVO, JR.**, Respondent, holds Texas Educator Certificate No. XXX-XX-66-13 and is subject to the jurisdiction of this Board.

2.    Respondent's Texas Educator Certificate was in full force and effect at all times material and relevant to this Petition.

3.    At all times material hereto, Respondent was employed with the Rio Grande City Consolidated Independent School District, in Rio Grande City, Texas, as a track and field coach at Rio Grande City High School.

4.    Respondent is currently on paid administrative leave from Rio Grande City CISD.

5.    In or around the spring of 2008, Respondent intentionally or knowingly engaged in sexual contact with "Student 1," a person under the age of 17 years of age, on numerous occasions.

6.    At or around the time in question, the spring of 2008, Student 1 was a student at Rio Grande City High School and a member of the track and field team coached by Respondent.

7.    In or around February of 2008, Student 1 injured her hamstring while running at a track meet. Respondent took Student 1 to a bus and massaged her leg at that time.

8.    As the injury did not heal, Respondent continued to massage Student 1's leg/hamstring area and would move farther and farther up her leg as he massaged her. Ultimately, Respondent's touching became inappropriate, moving up into Student 1's genital area.

9. Also during the spring of 2008, Student 1, along with other female students on the girls' track team, would go to Respondent's home to soak in his "hot tub," which was actually a Jacuzzi-style bathtub in the master bathroom of his home.

10. On one of these occasions when Student 1 was alone with Respondent in his home, in or around April 2008, Respondent invited Student 1 to use his "hot tub." He then asked her to lie on his bed so that he could massage her leg. At that time, Respondent then proceeded to engage in sexual intercourse and oral sex with Student 1.

11. Subsequently, Respondent engaged in sexual relations with Student 1 on school property in the Field House.

12. Continuing on through the spring semester of 2008, Respondent would engage in inappropriate touching of Student 1, sometimes occurring on school property.

13. During this time, Respondent told Student 1 that he had to continue to massage her because it was the only way she would perform well at the district and regional level track meets.

14. Respondent also told Student 1 that if she told the athletic trainer she was injured, the trainer would not let Student 1 run in the district and regional track meets.

15. Respondent also told Student 1 that if she told anyone of the sexual nature of their relationship that he would destroy her chances of getting a college scholarship, which he had assisted her in obtaining.

16. Further, during the spring of 2008, there were approximately 480 phone calls exchanged between Respondent and Student 1. Over 80 of these phone calls were placed after 10:00 p.m. at night.

17. Student 1 graduated from Rio Grande City High School in May of 2008 and left for college on a track & field scholarship that next fall.

18. In May of 2009, a college counselor notified the authorities in Starr County, Texas, that Student 1 reported to her that she had been sexually assaulted by Respondent in the spring of 2008.

19. On or about May 26, 2009, the Starr County District Attorney's office was made aware of information that a sexual assault involving Respondent had taken place on Rio Grande City CISD premises approximately one (1) year prior.

20. On or about May 27, 2009, the Rio Grande City CISD Police Department opened the case and investigation was initiated into the aforementioned events.

21. On or about May 29, 2009. Respondent was arrested on two (2) warrants of sexual assault, both 2nd degree felony offenses.

22. In the October 2009 term of the Starr County Grand Jury, Respondent was indicted on two (2) counts of sexual conduct against Student 1, occurring while Respondent was an employee of a public secondary school.

23. The criminal case proceeded to trial by jury on the two (2) counts of Improper Relationship between Educator and Student and Respondent was found to be "not guilty" on both counts.

24. Petitioner asserts that Respondent's conduct as outlined herein indicates that the Respondent is a person unworthy to instruct or supervise the youth of this state in violation of 19 TAC §249.15(b)(2).

25. Petitioner asserts that Respondent's conduct as outlined herein indicates that the Respondent has violated a provision of the Educators' Code of Ethics, specifically Standard 1.7, 19 TAC §247.2(b)(1)(G), by failing to comply with state regulations, written local school board policies, and other applicable state and federal laws.

26. Petitioner asserts that Respondent's conduct outlined herein indicates that the Respondent has violated a provision of the Educators' Code of Ethics, specifically Standard 3.2, 19 TAC §247.2(b)(3)(B), by knowingly treating a student in a manner that adversely affects the students' learning, physical health, mental health, or safety.

27. Petitioner asserts that Respondent's conduct outlined herein indicates that the Respondent has violated a provision of the Educators' Code of Ethics, specifically Standard 3.5, 19 TAC §247.2(b)(3)(E), by engaging in physical mistreatment of a student.

28. Petitioner asserts that Respondent's conduct outlined herein indicates that the Respondent has violated a provision of the Educators' Code of Ethics, specifically Standard 3.6, 19 TAC §247.2(b)(3)(F), by soliciting or engaging in sexual conduct or a romantic relationship with a student.

29. Petitioner asserts that Respondent's conduct outlined herein indicates that the Respondent has committed an act described in 19 TAC §249.14(g)(1), conduct that indicates a risk to the health, safety, or welfare of a student or minor; parent of a student, fellow employee or professional colleague.

30. Petitioner asserts that Respondent's conduct outlined herein indicates that the Respondent has committed an act described in 19 TAC §249.17(d)(1), engaging in or soliciting sexual contact or romantic relationship with a student or minor.

## III.
## FAILURE TO REACH SETTLEMENT

Pursuant to 19 TAC §249.26(b)(4), Petitioner avers that the parties have failed to reach settlement of the matters asserted in this Petition.

## IV.
## NOTIFICATION TO RESPONDENT

Pursuant to 19 TAC §249.26(b)(6), Petitioner hereby notifies Respondent of the following:

**IF YOU DO NOT FILE A WRITTEN ANSWER TO THIS PETITION WITH THE TEXAS EDUCATION AGENCY ATTORNEY IDENTIFIED BELOW WITHIN 30 CALENDAR DAYS OF BEING SERVED WITH THIS PETITION, THE STATE BOARD FOR EDUCATOR CERTIFICATION MAY GRANT THE RELIEF REQUESTED IN THIS PETITION, INCLUDING REVOCATION OF YOUR CERTIFICATE BY DEFAULT. THE MATTERS ASSERTED IN THE PETITION WILL BE DEEMED ADMITTED UNLESS YOUR WRITTEN ANSWER SPECIFICALLY DENIES EACH ASSERTION PLED AND IS FILED WITHIN THE PRESCRIBED TIME PERIOD. IF YOU FILE A WRITTEN ANSWER BUT THEN FAIL TO ATTEND A SCHEDULED HEARING, THE STATE BOARD FOR EDUCATOR CERTIFICATION MAY GRANT THE RELIEF REQUESTED IN THIS PETITION, INCLUDING REVOCATION OF YOUR CERTIFICATE.**

## V.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Petitioner prays:

1. That the Administrative Law Judge enter a Proposal for Decision recommending that the Board ISSUE AN ORDER FOR A SANCTION UP TO AND INCLUDING PERMANENT REVOCATION of the Texas Educator Certificate Number XXX-XX-45-40, as authorized by 19 TAC §249.15 and §249.17.

2. That the Administrative Law Judge enter a PROPOSAL FOR DECISION containing FINDINGS OF FACT holding that the Respondent committed the acts as charged and alleged herein, CONCLUSIONS OF LAW holding that the Respondent violated the statutes and rules as charged and alleged herein, and a RECOMMENDATION that Petitioner exercise its authority pursuant to 19 TAC §249.15 and 19 TAC §249.17 to take the aforementioned DISCIPLINARY ACTION against the Respondent's Texas Educator Certificate; and

3. Petitioner specifically prays for any such other relief to which it may be entitled under law or equity.

Respectfully submitted,

By: _____

**Merle Hoffman Dover**
State Bar No. 00787706
Texas Education Agency
1701 N. Congress Ave.
Austin, Texas 78701-1494
Tele: (512) 463-9716
Fax: (512) 463-7545

Attorney for Petitioner TEA/SBEC

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of June 2011, a true and correct copy of this Original Petition has been forwarded to:

ERASMO MONTALVO, JR.
3461 Mockingbird Drive
Rio Grande City, Texas 78582

*Via CMRRR #91 7199 9991 7030 1539 8741 and First Class U.S. Mail*

MARK W. ROBINETT
Brim, Arnett, Robinett, Conners &
McCormick, P.C.
2525 Wallingwood Drive, Bldg. 14
Austin, Texas 78746

*Via CMRRR #91 7199 9991 7030 1539 8734 and First Class U.S. Mail*

_____
**Merle Hoffman Dover**

# TAB B

Historical Rule for the Texas Administrative
Code - 19 Texas Administrative Code §249.3

**Historical Rule for the Texas Administrative Code**

| | |
|---|---|
| TITLE 19 | EDUCATION |
| PART 7 | STATE BOARD FOR EDUCATOR CERTIFICATION |
| CHAPTER 249 | DISCIPLINARY PROCEEDINGS, SANCTIONS, AND CONTESTED CASES |
| SUBCHAPTER A | GENERAL PROVISIONS |
| RULE §249.3 | Definitions |

The following words, terms, and phrases, when used in this chapter, shall have the following meanings, unless the context clearly indicates otherwise.

(1) Administrative denial--a decision or action by the Texas Education Agency (TEA) staff to deny a person any of the following based on the withholding or voiding of certification test scores; the invalidation of a certification test registration; or evidence of a lack of good moral character or improper conduct:

(A) admission to an educator preparation program;

(B) certification (including certification following revocation, cancellation, or surrender of a previously issued certificate) or renewal of certification; or

(C) reinstatement of a previously suspended certificate.

(2) Administrative law judge (ALJ)--a person appointed by the chief judge of the State Office of Administrative Hearings (SOAH) under Texas Government Code, Chapter 2003.

(3) Answer--the initial responsive pleading filed in reply to factual and legal issues raised by a petition.

(4) Applicant--a party seeking any of the following from the TEA staff or the State Board for Educator Certification (SBEC): issuance of a certificate (including issuance of a new certificate following revocation, cancellation, or surrender of a previously issued certificate); renewal of a certificate; or reinstatement of a suspended certificate.

(5) Cancellation--the invalidation of an erroneously issued certificate.

(6) Certificate--the whole or part of any certificate, permit, approval, endorsement, or similar form of permission issued by the TEA staff or the SBEC. The official certificate is the record of the certificate as maintained on the SBEC's website.

(7) Certificate holder--a person who holds a certificate issued under the Texas Education Code (TEC), Chapter 21, Subchapter B.

(8) Chair--the presiding officer of the SBEC, elected pursuant to the TEC, §21.036, or other person designated by the chair to act in his or her absence or inability to serve.

(35) Reprimand--the SBEC's formal censuring of a certificate holder.

(A) An "inscribed reprimand" is a formal, published censure appearing on the face of the educator's virtual certificate.

(B) A "non-inscribed reprimand" is a formal, unpublished censure that does not appear on the face of the educator's virtual certificate.

(36) Revocation--a sanction imposed by the SBEC permanently invalidating an educator's certificate.

(37) Respondent--the party who contests factual or legal issues or both raised in a petition; the party filing an answer in response to a petition.

(38) Sanction--

(A) a disciplinary action by the SBEC, including a restriction, reprimand, suspension, surrender, or revocation of a certificate;

(B) a reasonable and lawful punitive measure imposed by the ALJ or presiding officer against a party, representative, or other participant involved in a disciplinary proceeding, hearing, or other matter under this chapter.

(39) State Board for Educator Certification--the SBEC acting through its voting members in a decision-making capacity.

(40) State Board for Educator Certification member(s)--one or more of the members of the SBEC, appointed and qualified under the TEC, §21.033.

(41) Surrender--an educator's voluntary, permanent relinquishment and invalidation of a particular certificate in lieu of disciplinary proceedings under this chapter and possible revocation of the certificate.

(42) Suspension--a sanction imposed by the SBEC temporarily invalidating a particular certificate until reinstated by the SBEC.

(43) Test administration rules or procedures--rules and procedures governing professional examinations administered by the SBEC through the TEA staff and a test contractor, including policies, regulations, and procedures set out in a test registration bulletin.

(44) Texas Education Agency staff--staff of the TEA assigned by the commissioner of education to perform the SBEC's administrative functions and services.

(45) Unworthy to instruct or to supervise the youth of this state--the determination that a person is unfit to hold a certificate under the TEC, Chapter 21, Subchapter B, or to be allowed on a school campus under the auspices of an educator preparation program.

(46) Virtual certificate--the official record of a person's certificate status as maintained on the SBEC's website.

**Source Note:** The provisions of this §249.3 adopted to be effective March 31, 1999, 24 TexReg 2304; amended to be effective December 16, 2007, 32 TexReg 9112

# TAB C

Texas Register - 19 Texas Administrative Code
Rule §249.3 Texas Register

# Texas Register

| | |
|---|---|
| TITLE 19 | EDUCATION |
| PART 7 | STATE BOARD FOR EDUCATOR CERTIFICATION |
| CHAPTER 249 | DISCIPLINARY PROCEEDINGS, SANCTIONS, AND CONTESTED CASES |
| SUBCHAPTER A | GENERAL PROVISIONS |
| RULE §249.3 | Definitions |
| ISSUE | 12/16/2011 |
| ACTION | Final/Adopted |

Preamble                                                    Texas Admin Code
                                                                   Rule

---

The following words, terms, and phrases, when used in this chapter, shall have the following meanings, unless the context clearly indicates otherwise.

(1)Abuse--Includes the following acts or omissions:

(A)mental or emotional injury to a student or minor that results in an observable and material impairment in the student's or minor's development, learning, or psychological functioning;

(B)causing or permitting a student or minor to be in a situation in which the student or minor sustains a mental or emotional injury that results in an observable and material impairment in the student's or minor's development, learning, or psychological functioning;

(C)physical injury that results in substantial harm to a student or minor, or the genuine threat of substantial harm from physical injury to the student or minor, including an injury that is at variance with the history or explanation given and excluding an accident or reasonable discipline; or

(D)sexual conduct harmful to a student's or minor's mental, emotional, or physical welfare.

(2)Administrative denial--A decision or action by the Texas Education Agency staff, acting on behalf of the State Board for Educator Certification, to deny certification (including certification following revocation, cancellation, or surrender of a previously issued certificate), renewal of certification, or reinstatement of a previously suspended certificate based on the withholding or voiding of certification test scores; the invalidation of a certification test registration; evidence of a lack of good moral character; or evidence of improper conduct.

(3)Administrative law judge--A person appointed by the chief judge of the State Office of Administrative Hearings under the Texas Government Code, Chapter 2003.

(4)Answer--The responsive pleading filed in reply to factual and legal issues raised in a petition.

(5)Applicant--A party seeking issuance, renewal, or reinstatement of a certificate from the Texas Education Agency staff or the State Board for Educator Certification.

(6)Cancellation--The invalidation of an erroneously issued certificate.

(46)Respondent--The party who contests factual or legal issues or both raised in a petition; the party filing an answer in response to a petition.

(47)Restricted--The condition of an educator certificate that has had limitations or conditions on its use imposed by State Board for Educator Certification order.

(48)Revocation--A sanction imposed by the State Board for Educator Certification invalidating an educator's certificate.

(49)Sanction--A disciplinary action by the State Board for Educator Certification, including a restriction, reprimand, suspension, revocation of a certificate, or a surrender in lieu of disciplinary action.

(50)Serious state assessment testing violation--Failure to observe the requirements of test administration, security, and confidentiality of any assessment required by the Texas Education Code, Chapter 39, Subchapter B, in a manner that involves dishonesty or intent to affect the test score of a student, the evaluation of an educator, or the state or federal accountability rating of a school district or a campus. The term does not include benchmark tests or other locally required assessments.

(51)Solicitation of a romantic relationship--Deliberate or repeated acts that can be reasonably interpreted as the solicitation by an educator of a relationship with a student that is romantic in nature. A romantic relationship is often characterized by a strong emotional or sexual attachment and/or by patterns of exclusivity, but does not include appropriate educator-student relationships that arise out of legitimate contexts such as familial connections or longtime acquaintance. The following acts, considered in context, may constitute prima facie evidence of the solicitation by an educator of a romantic relationship with a student:

(A)behavior, gestures, expressions, or communications with a student that are unrelated to the educator's job duties and evidence a romantic intent or interest in the student, including statements of love, affection, or attraction. Factors that may be considered in determining the romantic intent of such communications or behavior, include, without limitation:

(i)the nature of the communications;

(ii)the timing of the communications;

(iii)the extent of the communications;

(iv)whether the communications were made openly or secretly;

(v)the extent that the educator attempts to conceal the communications;

(vi)if the educator claims to be counseling a student, the State Board for Educator Certification may consider whether the educator's job duties included counseling, whether the educator reported the subject of the counseling to the student's guardians or to the appropriate school personnel, or, in the case of alleged abuse or neglect, whether the educator reported the abuse or neglect to the appropriate authorities; and

(vii)any other evidence tending to show the context of the communications between educator and student;

(B)making inappropriate comments about a student's body, creating or transmitting sexually

# TAB D

Excerpts from Education Code of:  Professional
Practices Commissions

math students. Such expanded opportunities shall be for remedial, regular, and talented and gifted instruction. Therefore, local school districts are authorized and encouraged to establish such programs to increase both the numbers of students dedicated to the study of math and science and the quality and quantity of instructional time in both areas.

(c) The commissioner of education is authorized and directed to select school districts of various types to conduct pilot program studies to determine the most effective models for implementation of this program. Such pilot program studies shall be conducted during the 1984–85 biennium.

(d) The commissioner of education, upon completion of successful pilot program studies shall publish and disseminate to all school districts model programs to achieve the goals of this subchapter.

(e) The commissioner of education shall report the results of the pilot studies to the 69th Legislature and may make recommendations for the inclusion of such programs in the Foundation School Program.

(f) Local school districts may volunteer for the pilot studies and, if selected by the commissioner to participate, are authorized and encouraged to provide an amount of up to $5,000 as supplemental pay for each math and science teacher selected to participate in the pilot programs. Such funds shall be included in the participating teacher's regular payroll.

(g) The commissioner of education, if funds are available either through the Foundation School Program or through various regional service center grants or funds, may forward funds to the local participating districts in the pilot programs to assist in local funding of these programs. In addition, local school districts are encouraged to seek private funding, including foundation support to pursue the goals of this subchapter.

[Acts 1983, 68th Leg., p. 4808, ch. 845, § 1, eff. Aug. 29, 1983.]

[Sections 13.118 to 13.200 reserved for expansion]

SUBCHAPTER D. TEACHERS' PROFESSIONAL PRACTICES

### § 13.201. Responsibilities of the Teaching Profession

Teaching is hereby declared to be and is recognized as a profession. The members of such profession shall accept responsibilities in development and promotion of high standards of ethics, conduct, and professional performance and practices of persons engaged in the practice of such profession in this state.

[Acts 1971, 62nd Leg., p. 1479, ch. 405, § 2, eff. May 26, 1971.]

### § 13.202. Definitions

In this subchapter:

(1) "Teacher" means a superintendent, principal, supervisor, classroom teacher, counselor, or other professional employee who is required to hold a valid certificate or teaching permit.

(2) "Commission" means the Teachers' Professional Practices Commission established by this subchapter.

(3) "Code of ethics and standard practices" means the rules, regulations and standards of conduct which have been adopted and promulgated by the commission pursuant to Section 13.210 of this code.

[Acts 1971, 62nd Leg., p. 1479, ch. 405, § 2, eff. May 26, 1971.]

### § 13.203. Professional Practices Commission

There is hereby created a Teachers' Professional Practices Commission consisting of 15 members selected from the several professional groups, as follows:

3 elementary classroom teachers

3 secondary classroom teachers

2 counselors

1 elementary principal

1 secondary principal

1 supervisor

1 superintendent (1,000 or more teachers)

1 superintendent (fewer than 1,000 teachers)

1 junior college teacher

1 senior college teacher (engaged in teacher education)

[Acts 1971, 62nd Leg., p. 1479, ch. 405, § 2, eff. May 26, 1971.]

### § 13.2031. Application of Sunset Act

The Teachers' Professional Practices Commission is subject to the Texas Sunset Act;[1] and unless continued in existence as provided by that Act the commission is abolished effective September 1, 1989.

[Acts 1977, 65th Leg., p. 1854, ch. 735, § 2.156, eff. Aug. 29, 1977.]

[1] Vernon's Ann.Civ.St. art. 5429k.

### § 13.204. Qualifications of Members

To be eligible for membership on the commission, a person must be actively engaged in teaching, fully certified for the position he holds, and must have at least five years' teaching experience in Texas, including the two years immediately preceding nomination and appointment.

[Acts 1971, 62nd Leg., p. 1479, ch. 405, § 2, eff. May 26, 1971.]

ndent, princi-
counselor, or
s required to
g permit.

eachers' Pro-
tablished by

'd practices''
standards of
and promul-
t to Section

, eff. May 26,

nission

Professional
members se-
oups, as fol-

achers)

00 teachers)

in teacher

eff. May 26,

Commission
and unless
hat Act the
ber 1, 1989.
§ 2.156, eff.

commission,
ching, fully
ust have at
Texas, in-
eding nomi-

eff. May 26,

## § 13.205. Appointment

The members of the commission shall be appointed by the governor, subject to confirmation by the senate. The governor shall request appropriate statewide professional organizations of teachers and/or school administrators to submit a list of three qualified nominees for vacancies within their respective professional groups on the commission; such nominations shall be advisory.

[Acts 1971, 62nd Leg., p. 1479, ch. 405, § 2, eff. May 26, 1971.]

## § 13.206. Terms of Office

One-third of the members of the commission first appointed shall be selected to serve for a term of one year; one-third to serve for a term of two years; and the remaining one-third for a term of three years; and members appointed for succeeding terms shall serve for terms of three years. No person shall serve for more than two consecutive terms as a member of the commission.

[Acts 1971, 62nd Leg., p. 1480, ch. 405, § 2, eff. May 26, 1971.]

## § 13.207. Expenses

Members of the commission shall serve without pay, but shall be reimbursed for their actual and reasonable traveling expenses in attendance on commission meetings, and in attending meetings of committees of such commission.

[Acts 1971, 62nd Leg., p. 1480, ch. 405, § 2, eff. May 26, 1971.]

## § 13.208. Officers; Meetings; Rules

The commission shall annually select a chairman, vice chairman, and secretary. The commission shall meet not less than three times each year in Austin at a place, time, and hour determined by the commission (at least 10 days' notice in writing by chairman shall constitute proper notice). A majority shall constitute a quorum, and a majority of such quorum shall have authority to act upon any matter properly before the commission. The commission shall adopt its own rules of order and procedure not inconsistent with this subchapter and shall hold meetings pursuant to the provisions of this subchapter.

[Acts 1971, 62nd Leg., p. 1480, ch. 405, § 2, eff. May 26, 1971.]

## § 13.209. Privileged Status of Members

Members of the commission shall be privileged in their utterances while acting in good faith in the course of their duties.

[Acts 1971, 62nd Leg., p. 1480, ch. 405, § 2, eff. May 26, 1971.]

## § 13.210. Adoption of Code of Ethics and Standard Practices

(a) After public hearings at which associations and individuals representing the teaching profession and other interested persons shall have full opportunity to submit and request adoption of all or part of the provisions of unofficial codes of ethics that have been adopted by state and national associations of members of the teaching profession, and to support, oppose, or request amendments to proposals, the commission shall develop and adopt a "code of ethics and standard practices" which shall regulate and govern the conduct of members of the profession.

(b) The code of ethics and standard practices adopted by the commission shall include standards of professional teaching practices and professional performance, and standards of ethical conduct of members of the teaching profession toward other members of the profession, parents, students, and the community.

(c) The professional standards developed by the commission shall be submitted by the Texas Education Agency to all active certificated professional personnel in a referendum to determine approval or disapproval of each individual standard and the commission shall have available the results of the referendum and give them consideration before finally adopting the standards.

(d) The commission shall likewise have power to revise or adopt amendments to the code of ethics and standard practices.

(e) The code of ethics and standard practices originally adopted by the commission, and in like manner any amendment thereto or revision thereof, shall become effective on the first day of September following the expiration of 90 days after the full text of the professional standards so adopted by the commission or the amendment or revision so adopted shall have been filed with the Commissioner of Education of the State of Texas. No professional standards disapproved in the referendum vote shall be adopted.

(f) It shall be the duty of the commissioner of education on request of any member of the profession, licensed in this state, to furnish him a copy of the code of ethics and standard practices, together with amendments then in effect.

[Acts 1971, 62nd Leg., p. 1480, ch. 405, § 2, eff. May 26, 1971.]

## § 13.211. Unprofessional Practice

A violation of any rule or provision of the code of ethics and standard practices adopted in conformity with this subchapter shall be deemed to be "unprofessional practice," which shall constitute grounds for suspension or revocation of the teaching certificate of the member, which grounds shall be additional to those specified in Section 13.046 of this code;

or the member may be warned or reprimanded for such violation, if in the judgment of the commissioner of education the violation is not of sufficient gravity to require suspension or revocation of the teaching certificate.
[Acts 1971, 62nd Leg., p. 1481, ch. 405, § 2, eff. May 26, 1971.]

## § 13.212. Advisory Function of Commission

The commission shall act in an advisory capacity to the state commissioner of education and to the State Board of Education in matters of interpretation and enforcement of the code of ethics and standard practices.
[Acts 1971, 62nd Leg., p. 1481, ch. 405, § 2, eff. May 26, 1971.]

## § 13.213. Complaint, Notice, Hearing, Recommendations

(a) The commission shall be authorized to receive written complaints from any certified teacher of alleged violation by any member of the profession of any rule or provision of the code of ethics and standard practices, and may hear the matter en banc, or may refer the matter to a committee of the commission, composed of three of its members, for hearing, as it may order.

(b) Upon receipt of a complaint, the commission shall give to the member against whom the complaint is made at least 15 days' notice of the nature of the complaint, and the time and place at which the commission, or a panel thereof, will hear the matter, such notice to be given by registered mail addressed to the member.

(c) At any hearing before the commission, or before a panel of the commission, the member complained of shall be entitled to produce witnesses in his behalf, and shall have a right to be represented by counsel. After hearing (which shall be private unless the party affected requests a public hearing), the commission, or the hearing panel, shall make findings and recommendations whether the complaint shall be dismissed or whether the complaint shall be heard by the commissioner of education.

(d) The commission or panel thereof hearing the matter shall file its recommendations with the commissioner of education and shall also file with him a transcript of any evidence presented before it.
[Acts 1971, 62nd Leg., p. 1481, ch. 405, § 2, eff. May 26, 1971.]

## § 13.214. Action of Commissioner on Complaints

(a) In cases wherein the commission, or the panel thereof hearing the matter, has recommended dismissal of the complaint, the commissioner of education may dismiss the complaint without further hearing. No appeal shall lie from the action of the commissioner of education in dismissing a complaint hereunder.

(b) In cases where the commission, or the pane thereof hearing the matter, shall recommend suspension or revocation of the certificate of any member the commissioner of education may dismiss the complaint on the basis of the record certified to him, or may set the matter for hearing and disposition by the commissioner of education; and from his final decision in the matter, after hearing, appeal shall lie to the State Board of Education. The party charged by the complaint may appeal the decision of the State Board of Education to the district court of the county of his residence. The trial on appeal in the district court shall be conducted de novo.

(c) Nothing in this section contained is intended to bind the commissioner of education to adopt the findings and recommendations of the commission, or any panel thereof.

(d) The commissioner of education shall have power to adopt rules of procedure (subject to approval of the State Board of Education) for the conduct of hearings before him pursuant to this subchapter.
[Acts 1971, 62nd Leg., p. 1481, ch. 405, § 2, eff. May 26, 1971.]

## § 13.215. Appeals

In all appeals prosecuted in any of the courts of this state pursuant to the provisions of this subchapter, such trials shall be de novo as that term is used and understood in appeals from justice of the peace courts to county courts. When such an appeal is filed and the court thereby acquires jurisdiction, all administrative or executive action taken prior thereto shall be null and void and of no force and effect, and the rights of the parties thereto shall be determined by the court upon a trial of the matters in controversy under rules governing the trial of other civil suits in the same manner and to the same extent as though the matter had been committed to the courts in the first instance and there had been no intervening administrative or executive action or decision. Under no circumstances shall the substantial evidence rule as interpreted and applied by the courts of Texas in other cases ever be used or applied to appeals prosecuted under the provisions of this subchapter.
[Acts 1971, 62nd Leg., p. 1482, ch. 405, § 2, eff. May 26, 1971.]

## § 13.216. Strikes, etc.

Any certified teacher who violates the provisions of Chapter 135, Acts of the 50th Legislature, 1947 (Article 5154c, Vernon's Texas Civil Statutes), shall be suspended by the commissioner of education.
[Acts 1971, 62nd Leg., p. 1482, ch. 405, § 2, eff. May 26, 1971.]

## § 13.217. Right to Join or Not to Join Professional Association

Nothing in this subchapter shall abridge the right of any certified teacher to join any professional

# TAB E

Excerpts from Education Code of: Professional
Practices Commissions

## § 13.046. Suspension and Cancellation of Certificates

(a) Any teacher's certificate issued under the provisions of this code or under any previous statute relating to the certification of teachers may be suspended or cancelled by the state commissioner of education under any one or more of the following circumstances:

(1) on satisfactory evidence that the holder is conducting his school or his teaching activities in violation of the laws of this state;

(2) on satisfactory evidence that the holder is a person unworthy to instruct the youth of this state; or

(3) on complaint made by the board of trustees that the holder of a certificate after entering into a written contract with the board of trustees of the district has without good cause and without the consent of the trustees abandoned the contract.

(b) Before any certificate shall be suspended or cancelled the holder shall be notified and shall have an opportunity to be heard. Any person whose certificate is suspended or cancelled by the state commissioner of education shall have the right of appeal to the State Board of Education.

(c) The state commissioner of education shall have the authority, upon the presentation of satisfactory evidence, to reinstate any teacher's certificate suspended or cancelled under the provisions of this section. On a refusal of the commissioner so to reinstate a certificate, the applicant shall have the right of appeal to the State Board of Education.

(d) The state commissioner of education may suspend a teacher's certificate under the terms of this section for a period not to exceed one year.

(e) The state commissioner of education shall have the right to reprimand a teacher, rather than to suspend or cancel that teacher's certificate, in those cases the commissioner deems appropriate. A reprimand shall not be appealable.

[Acts 1969, 61st Leg., p. 2794, ch. 889, § 1, eff. Sept. 1, 1969; Acts 1971, 62nd Leg., p. 1474, ch. 405, § 2, eff. May 26, 1971; Acts 1979, 66th Leg., p. 666, ch. 294, § 1, eff. Aug. 27, 1979.]

[Sections 13.047 to 13.100 reserved for expansion]

## SUBCHAPTER C. TEACHERS' EMPLOYMENT CONTRACTS

## § 13.101. Probationary or Continuing Contract

Each teacher hereafter employed by any school district in this state shall be employed under, and shall receive from such district, a contract that either a "probationary contract" or a "continuing contract" in accordance with the provisions of this subchapter if the school board chooses to offer such teacher a "probationary contract" or a "continuing contract." All such contracts shall be in writing, such form as may be promulgated by or approved by the commissioner of education, and shall embody the terms and conditions of employment hereinafter set forth, and such other provisions not inconsistent with this subchapter as may be appropriate.

[Acts 1969, 61st Leg., p. 2925, ch. 889, § 1, eff. Sept. 1, 1969; Acts 1971, 62nd Leg., p. 1474, ch. 405, §§ 2, 54(1).]

## § 13.102. Probationary Contract

Any person who is employed as a teacher by any school district for the first time, or who has not been employed by such district for three consecutive school years subsequent to August 28, 1967, shall be employed under a "probationary contract," which shall be for a fixed term as therein stated; provided, that no such contract shall be for a term exceeding three school years beginning on September 1 next ensuing from the making of such contract; and provided further that no such contract shall be made which extends the probationary contract period beyond the end of the third consecutive school year of such teacher's employment by the school district, unless the board of trustees determines and recites that it is in doubt whether the particular teacher should be given a continuing contract, in which event a probationary contract may be made with such teacher for a term ending with the fourth consecutive school year of such teacher's employment with the school district, at which time the employment of such teacher by such school district shall be terminated, or such teacher shall be employed under a continuing contract as hereinafter provided.

[Acts 1969, 61st Leg., p. 2925, ch. 889, § 1, eff. Sept. 1, 1969; Acts 1971, 62nd Leg., p. 1474, ch. 405, §§ 2, 54(1).]

## § 13.103. Probationary Contract: Termination

The board of trustees of any school district may terminate the employment of any teacher holding a probationary contract at the end of the contract period, if in their judgment the best interests of the school district will be served thereby; provided, that notice of intention to terminate the employment shall be given by the board of trustees to the teacher on or before April 1, preceding the end of the employment term fixed in the contract. In event of failure to give such notice of intention to terminate within the time above specified, the board of trustees shall thereby elect to employ such probationary teacher in the same capacity, and under probationary contract status for the succeeding school year if the teacher has been employed by such district for

# TAB F

Proposed Rules, December 11, 1998,
23 Tex. Reg 12615

(48) Revocation—a sanction imposed by the board permanently invalidating an educator's certificate.

(49) Respondent—the party who contests factual or legal issues or both raised in a petition; the party filing an answer in response to a petition.

(50) Sanction—

(A) a disciplinary action by the board, including a restriction, reprimand, suspension, surrender, cancellation, or revocation of a certificate;

(B) a reasonable and lawful punitive measure imposed by the ALJ or presiding officer against a party, representative, or other participant involved in a disciplinary proceeding, hearing, or other matter under this chapter.

(51) Staff—employees of the board as a state agency and hired by the executive director.

(52) Surrender—an educator's voluntary, permanent relinquishment and invalidation of a particular certificate in lieu of disciplinary proceedings under this chapter and possible revocation of the certificate.

(53) Suspension or suspend(ed)—a sanction imposed by the board temporarily invalidating a particular certificate until reinstated by the board.

(54) Test administration rules and procedures—rules and procedures governing professional examinations administered by the board through the staff and a test contractor, including policies, regulations, and procedures set out in a test registration bulletin.

(55) Unworthy to instruct or to supervise the youth of this state—the determination that a person is unfit to hold a certificate under Subchapter B, Chapter 21, of the Act or to be allowed on a school campus under the auspices of an educator preparation program.

§249.4. Applicability.

(a) In conjunction with the rules of practice and procedure of the office (1 Texas Administrative Code Chapter 155 (relating to Rules of Procedure)) and other applicable law, this chapter shall govern disciplinary matters before the board, including the following proceedings:

(1) sanctions sought against a certificate holder;

(2) enforcement of the code of ethics;

(3) appeals of administrative denials;

(4) appeals of the administrative cancellation or withholding of test scores for alleged violation of test administration rules;

(5) reinstatement of a suspended certificate;

(6) removal or modification of a sanction other than revocation, cancellation, or surrender;

(7) complaints of contract abandonment filed with the agency pursuant to §§21.105(c), 21.160(c), or 21.210(c), of the Act; and

(8) sanctions sought against a certificate for the holder's knowing failure to report criminal history or other information required to be reported under Subchapter C, Chapter 22, of the Act; Subchapter B, Chapter 261, of the Texas Family Code; or this chapter.

(b) The office shall conduct all contested case hearings held under this chapter.

(c) This chapter shall apply to any matter referred to the office on or after the effective date of this chapter.

(d) This chapter does not apply to matters related to the proposal or adoption of board rules under the APA or to internal personnel policies or practices of the executive director or the board. The provisions of this chapter may not be used to seek sanctions against a member of the board or the agency's staff acting in that capacity.

§249.5. Purposes.

The purposes of this chapter are as follows:

(1) to protect the safety and welfare of Texas schoolchildren and school personnel;

(2) to ensure educators and applicants are morally fit and worthy to instruct or to supervise the youth of the state;

(3) to regulate and to enforce the standards of conduct of educators and applicants;

(4) to provide for disciplinary proceedings in conformity with the APA and the rules of practice and procedure of the office;

(5) to enforce an educator's code of ethics;

(6) to fairly and efficiently resolve disciplinary proceedings at the least expense possible to the parties and the state;

(7) to promote the development of legal precedents through board decisions to the end that disciplinary proceedings may be justly resolved; and

(8) to provide for regulation and general administration pursuant to the board's enabling statutes.

§249.6. Construction.

(a) This chapter shall be liberally construed in conformity with the APA and the rules of practice and procedure of the office so as to achieve the purposes for which it was adopted, without changing the statutory jurisdiction, powers, or authority of the board.

(b) "Includes" and "including" are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded.

(c) If any provision of this chapter is declared invalid by a court of competent jurisdiction, such invalidity shall not affect other provisions of this chapter that can be applied without the invalid provision. To that end, the board declares the provisions of this chapter to be severable.

§249.7. Signature Authority; Seal.

(a) The board may delegate to the chair the authority to sign on behalf of a majority of the board members a decision made or order issued under this chapter.

(b) As provided by this chapter, the executive director may sign final orders dismissing cases by agreement of the parties or by non-suit of the petitioner as well as those relating to other matters as provided by this chapter.

(c) The board and executive director may maintain a seal to authenticate their official acts under this chapter, including certifying copies of records showing decisions or orders of the board or the executive director. The seal shall have a star with five points and the words "State Board for Educator Certification" on it.

§249.8. Agreements to Be in Writing.

Unless otherwise provided in this chapter, no agreement between parties or their representatives related to a matter under this chapter

# TAB G

Texas Administrative Code,
19 Texas Administrative Code Rule §247.2

| | |
|---|---|
| **TITLE 19** | EDUCATION |
| **PART 7** | STATE BOARD FOR EDUCATOR CERTIFICATION |
| **CHAPTER 247** | EDUCATORS' CODE OF ETHICS |
| **RULE §247.2** | **Code of Ethics and Standard Practices for Texas Educators** |

(a) Statement of Purpose. The Texas educator shall comply with standard practices and ethical conduct toward students, professional colleagues, school officials, parents, and members of the community and shall safeguard academic freedom. The Texas educator, in maintaining the dignity of the profession, shall respect and obey the law, demonstrate personal integrity, and exemplify honesty. The Texas educator, in exemplifying ethical relations with colleagues, shall extend just and equitable treatment to all members of the profession. The Texas educator, in accepting a position of public trust, shall measure success by the progress of each student toward realization of his or her potential as an effective citizen. The Texas educator, in fulfilling responsibilities in the community, shall cooperate with parents and others to improve the public schools of the community.

(b) Enforceable Standards.

(1) Professional Ethical Conduct, Practices and Performance.

(A) Standard 1.1. The educator shall not knowingly engage in deceptive practices regarding official policies of the school district or educational institution.

(B) Standard 1.2. The educator shall not knowingly misappropriate, divert, or use monies, personnel, property, or equipment committed to his or her charge for personal gain or advantage.

(C) Standard 1.3. The educator shall not submit fraudulent requests for reimbursement, expenses, or pay.

(D) Standard 1.4. The educator shall not use institutional or professional privileges for personal or partisan advantage.

(E) Standard 1.5. The educator shall neither accept nor offer gratuities, gifts, or favors that impair professional judgment or to obtain special advantage. This standard shall not restrict the acceptance of gifts or tokens offered and accepted openly from students, parents, or other persons or organizations in recognition or appreciation of service.

(F) Standard 1.6. The educator shall not falsify records, or direct or coerce others to do so.

(G) Standard 1.7. The educator shall comply with state regulations, written local school board policies, and other applicable state and federal laws.

(H) Standard 1.8. The educator shall apply for, accept, offer, or assign a position or a responsibility on the basis of professional qualifications.

(2) Ethical Conduct Toward Professional Colleagues.

(A) Standard 2.1. The educator shall not reveal confidential health or personnel information concerning colleagues unless disclosure serves lawful professional purposes or is required by law.

(B) Standard 2.2. The educator shall not harm others by knowingly making false statements about a colleague or the school system.

(C) Standard 2.3. The educator shall adhere to written local school board policies and state and federal laws regarding the hiring, evaluation, and dismissal of personnel.

(D) Standard 2.4. The educator shall not interfere with a colleague's exercise of political, professional, or citizenship rights and responsibilities.

(E) Standard 2.5. The educator shall not discriminate against or coerce a colleague on the basis of race, color, religion, national origin, age, sex, disability, or family status.

(F) Standard 2.6. The educator shall not use coercive means or promise of special treatment in order to influence professional decisions or colleagues.

(G) Standard 2.7. The educator shall not retaliate against any individual who has filed a complaint with the SBEC under this chapter.

(3) Ethical Conduct Toward Students.

(A) Standard 3.1. The educator shall not reveal confidential information concerning students unless disclosure serves lawful professional purposes or is required by law.

(B) Standard 3.2. The educator shall not knowingly treat a student in a manner that adversely affects the student's learning, physical health, mental health, or safety.

(C) Standard 3.3. The educator shall not deliberately or knowingly misrepresent facts regarding a student.

(D) Standard 3.4. The educator shall not exclude a student from participation in a program, deny benefits to a student, or grant an advantage to a student on the basis of race, color, sex, disability, national origin, religion, or family status.

(E) Standard 3.5. The educator shall not engage in physical mistreatment of a student.

(F) Standard 3.6. The educator shall not solicit or engage in sexual conduct or a romantic relationship with a student.

(G) Standard 3.7. The educator shall not furnish alcohol or illegal/unauthorized drugs to any student or knowingly allow any student to consume alcohol or illegal/unauthorized drugs in the presence of the educator.

---

**Source Note:** The provisions of this §247.2 adopted to be effective March 1, 1998, 23 TexReg 1022; amended to be effective August 22, 2002, 27 TexReg 7530

Next Page          Previous Page

# TAB H

Commissioner of Education Decision

Copyright (c) 1985 Texas Education Agency

July 10, 1985; July 10, 1985

DOCKET NO. 065-R1B-284

**Reporter**

1985 TX Educ. Agency LEXIS 61

# LA WANDA *WHALEN* ; v. ; ROCKSPRINGS INDEPENDENT SCHOOL DISTRICT

## Core Terms

teacher, terminate, sexual, teach, sex education, classroom, school district, inappropriate, intercourse, educational purposes, homesteader, masturbate, emotional, reproduce, notice, rubber, sex

**Panel:** [*1] W. N. KIRBY, COMMISSIONER OF EDUCATION

## Opinion

DECISION OF THE COMMISSIONER

Statement of the Case

La Wanda *Whalen*, Petitioner, brings this appeal from a decision of the Board of Trustees of Rocksprings Independent School District (RISD), Respondent, to terminate Petitioner's contract during the first year of its two year term. Petitioner is represented by R. Emmett Harris, Attorney at Law, Uvalde, Texas. Respondent is represented by Judy Underwood, Attorney at Law, Austin, Texas.

A hearing on the merits of Petitioner's appeal was held in Austin, Texas on June 5 and June 25, 1984, before Rebecca M. Elliott, the Hearing Officer appointed by the State Commissioner of Education.

On November 30, 1984, the Hearing Officer issued a Proposal for Decision recommending to the State Commissioner of Education that Petitioner's appeal be denied. Our records reflect that a copy of the Proposal for Decision was received by both parties. No exceptions to the proposal were filed.

Findings of Fact

After due consideration of the evidence and matters officially noticed, in my capacity as State Commissioner of Education, I make the following Findings of Fact:

1. It is uncontested that Petitioner was employed [*2] by Respondent under a term contract during the 1983-84 school year.

2. It is uncontested that Petitioner's assignment included teaching Life Science to seventh grade students. A unit on sex education was a part of the course. (Tr. Vol 1: 20-21)

3. It is uncontested that Petitioner was terminated on November 22, 1983 by the Board of Trustees of Rocksprings ISD.

4. It is uncontested that Respondent based its decision to terminate Petitioner on a finding by the Board that on September 28 and 29, 1983, Petitioner made inappropriate comments to her seventh grade science class concerning sexual matters and had done so with an inappropriate amount of "levity and humor." The Board found that the following comments were made:

(A) On or about September 28, 1983, Ms. *Whalen* suggested that, should one of the boys in her class desire additional information concerning the male ejaculatory process, he should go home, lock the door to his restroom and masturbate. Ms. *Whalen* also suggested that two other male students in the room follow the same course.

(B) Ms. *Whalen*, on or about that same date, entered into an unnecessarily graphic description of homosexual intercourse.

(C) On or about the same [*3] date, Ms. *Whalen*, in response to a question concerning prophylatic devices, suggested that students should go behind the school district gymnasium if they had never seen a "rubber."

MARK ROBINETT

(See Respondent's Original Answer and letter dated November 9, 1983 from Donald Henslee, for Respondent, to Jay Brim, original counsel for Petitioner.)

5. In August, 1983, Petitioner was told by her principal, Mr. Ronald Kelly, that before she had any discussion on sex education, he would meet with her and the Home Economics teacher to revamp that unit and that some changes needed to be made, including:

(1) Separating the class by gender, with one group being taught by Petitioner and the other by the Home Economics teacher; and

(2) Developing a standard unit which would be presented to the Board for its approval.

(See Tr. Vol. 1: 20-21, 48, 116-17). The unit on sex education was not scheduled until the spring semester. (Tr. Vol. 1: 21).

6. On September 28 and 29, 1983, Petitioner became involved in a question and answer session with her fifth period science class in which she gave the following responses to questions propounded by her seventh-grade students concerning sexual activities and related [*4] matters.

(1) In response to a series of questions about AIDS and its transmission, Petitioner told her class that the disease was transmitted by homosexuals through anal intercourse. Petitioner further explained the mechanics of the physical contact, stating that one man puts his penis into the anus of another man. Petitioner also advised her class that the disease was transmitted through the mixing of blood and feces which resulted from the tearing of tissue during the act of intercourse. (See Tr. Vol. 1: 27, Vol 2: 52, 105, 201).

(2) Petitioner answered one student's question about what a "rubber" was by stating that it was either an animal skin or a rubber sheath placed over the male penis to prevent venereal diseases. (See Tr. Vol 1: 28). Petitioner also sketched a large condom on the board (Tr. Vol. 1: 28) and advised the child who asked what a "rubber" looked like that the prophylactic device could be found on the ground behind the school gymnasium or at the rodeo grounds. (See Tr. Vol. 1: 22, 53, 79, 105).

(3) Petitioner instructed one male student that if he wanted to know when sperm was produced he should go home, lock himself in the bathroom and masturbate. (See Tr. Vol. [*5] 2: 19-20, 37-38, 54, 106, 128, 169, 204).

(4) Petitioner answered a question about how one person could satisfy herself or give pleasure to herself without a member of the opposite sex by stating that a girl could "finger" herself. (Tr. Vol. 1: 120, 129).

7. The discussion on sexual matters was prompted by questions from a student regarding "reproduction." This term had been listed as one of the life processes in response to a test question being reviewed. The test questions concerned a unit of study in which the children were determining how to differentiate between living and nonliving objects in a hypothetical situation. Reproduction had been simply defined in the text as the production of offspring. (Tr. Vol. 1: 24-25, 47).

8. Petitioner continued the discussion again on Thursday, September 29, 1983, for the entire class period with the focus of the discussion on the more physiological aspects of reproduction. (Tr. Vol. 1: 36).

9. The questions discussed on September 28 and 29 had nothing to do with the subject matter in the text but were "just life questions in general." (Tr. Vol. 1: 53).

10. At a football game on September 29, Principal Kelly was advised by a parent of one [*6] of the children in Petitioner's class that there had been language and expressions used in the class that she did not want her child to hear. (Tr. Vol. 1: 74).

11. Petitioner was told on September 30, 1983, by Principal Kelly, that he had received a phone call from a parent concerning the discussions and that Petitioner was not to discuss sex anymore until the program was revamped. (Tr. Vol. 1: 43-44, 80).

12. Superintendent Connel received a complaint on September 30 from a parent reporting the use of bad language in the science class. (Tr. Vol. 1: 80). He requested Mr. Kelly to check out the allegation.

13. On Friday afternoon, September 30, Mr. Kelly met with the parent who had contacted Mr. Connel. The parent described the language used in the class as "gutter language" and specifically informed him that the words "queer" and "cunt" had been discussed. (Tr. Vol. 1: 81).

14. During a varsity football game on Friday night, September 30, Mr. Kelly was approached by yet another parent whose

son was in Petitioner's class. The father told Mr. Kelly that Petitioner had advised another young man in the class that if he wanted to find out what masturbation was that he should go in the [*7] bathroom and lock the door. (Tr. Vol. 1: 84).

15. Principal Kelly was told by members of the community, both Anglo and Mexican-American, that they did not want language and instruction like that used and given by Petitioner in her class to be continued in the schools. (Tr. Vol. 1: 101).

16. On Friday, October 7, 1983, Petitioner was suspended with pay pending a hearing by the Board of Trustees on November 22, 1983. (Tr. Vol. 1: 30).

17. The Board of Trustees held a hearing on November 22, 1983 to hear testimony regarding the allegations against Petitioner. The Board then terminated Petitioner for the discussions she had held on September 28 and 29, 1983 with her seventh grade science class. (See Transcript of Proceeding before Rocksprings Independent School District, filed in this appeal by stipulation of both parties).

Discussion

In her appeal before the Commissioner of Education, Petitioner contends that she was terminated by the Rocksprings Board of Trustees in retaliation for engaging in constitutionally protected speech and that the action of Respondent in doing so was without legal justification or basis and was unlawful and improper. The parties agree that the sole reason for [*8] terminating the employment relationship was a two-day discussion Petitioner participated in on September 28 and 29, 1984, in which sexually explicit information was given out by Petitioner and in which Petitioner made comments to her class regarding sexual activity which the Board felt were inappropriate. Throughout the hearing before the Agency, Petitioner has denied making the statements and has suggested that the students misconstrued her explanations. However, the seven students who testified were convincing in their accounts of the two-day discussion. (See Finding of Fact No. 6). Petitioner, then, must demonstrate that the statements she made were indeed protected and form an illegal basis for her discharge. Because the statements were made in the classroom, Petitioner's claim of protected speech is actually one of academic freedom, a right recognized under the First and Fourteenth Amendments. See _Webb v. Lake Mills Community School District, 344 F. Supp. 791, 799 (N. D. Iowa 1972)._ The classroom teacher cannot be made to "simply read from a script prepared or approved by the board." _Cary v. Bd. of Ed. Arapahoe Sch. Dist, 598 F.2d 535, 543 (10th Cir. 1979)._ [*9] On the other hand, although teachers "have some freedom in the techniques to be employed, they [do not] have unlimited liberty as to structure and content of the courses, at least at the secondary level." Id. The court in Webb also recognized that the state has an interest in limiting the discretion of a teacher, and that its interest grows stronger as the age of the student decreases. "Thus, the Fourteenth and First Amendments do not necessarily give teachers of younger students the same academic freedom' that they give teachers of college students." _344 F. Supp. at 799._ In addition, the teaching methods employed must be reasonably relevant to the subject matter the teacher is employed to teach. _Id. at 805._

Academic freedom, then, is not an absolute right and has a dual nature:

(1) The substantive right of a teacher to choose a teaching method which serves a demonstrated educational purpose; and

(2) The procedural right of a teacher not to be discharged for the use of a teaching method which is not proscribed by a regulation and as to which it was not shown that the teacher should have had notice that its use was prohibited.

[*10] It is concluded that, for Petitioner to prevail on her claim, she must show that her classroom discussion on September 28 and 29, 1983, was "reasonably relevant" to the subject matter she was employed to teach, and that the statements had both a demonstrated educational purpose and were not proscribed by an unlawful regulation.

In the instant case, Petitioner was terminated for making the three specific comments found in Finding of Fact No. 6 (1), (2), and (3). There was no evidence adduced at the hearing which would indicate that the discussion on homosexual intercourse, masturbation, or "rubbers" had any relevance to the unit of study on "life processes." Further, the relevancy of the comments to the term "reproduction" as defined in the text is remote. Even considering the unit on sex education which was authorized for study at a later time, the comments were too inappropriate to be "reasonably relevant" to a seventh-grade science class. The principal had indicated that the class was to be separated by gender when the topic was discussed and that the unit would be "revamped." (See Finding of Fact No. 5). Obviously, Respondent intended for the discussion on sex to be limited and [*11] to be handled in a delicate manner. In crossing the line from giving simply the physiological facts of reproduction to discussing the "how to," Petitioner assumed the burden of demonstrating that her comments were reasonably relevant to the course. She has failed to meet that burden.

Even if it is conceded that the discussion was in some way relevant to her science class, Petitioner still must prove that her comments had a demonstrated educational purpose. The only explanation Petitioner offered as to her purpose in

participating in this two-day discussion was her belief that children's questions should be answered at the time they are asked, not at some later date. (See Tr. Vol. 1: 40). It is concluded, however, that the references to homosexual intercourse, to masturbation, and to where to find discarded condoms had no educational purpose authorized to be taught in her school to seventh graders.

Finally, Petitioner was specifically instructed not to teach sex education until the unit had been revamped and approved. (See Finding of Fact No. 5). In *Cary, 598 F.2d 535, 541,* the court noted that "cases which held for the teachers and placed emphasis upon teachers' **[*12]** rights to exercise discretion in the classroom, seemed to be situations where school authorities acted in the absence of general policy, after the fact, and had little to charge against the teacher other than the assignment with which they were unhappy." (Emphasis added). The Commissioner joined the court in disapproving the use of "hindsight" by Boards of Trustees in a recent decision. See Oscar Villa v. Marathon ISD, No. 104-R1a-583, pp. 10, 11 (Comm. Educ., April 1984). However, Petitioner in this case was fully aware that her superiors wanted the boys and girls to be instructed about sex separately and at a later date. As in Villa (Id. at 2), the principal merely wanted to place reasonable limits on the dissemination of the appropriate information.

In conclusion, the lack of relevance of Petitioner's comments, the absence of a demonstrated educational purpose, and the fact that Petitioner was on notice that she was not to instruct her students about sex at that time, all support a holding that her classroom discussion was not protected by the First and Fourteenth Amendments. This holding, however, does not assure Respondent that its decision will be affirmed. Petitioner's activity **[*13]** must still constitute "cause" for her termination. *Tex. Educ. Code Ann. § 21.210* (Vernon Supp. 1983).

First, it should be noted that Respondent did not terminate Petitioner for failing to follow a directive not to teach sex education. Rather, the district contends that the comments themselves constitute cause for termination. In deciding whether the statements made by Petitioner constitute cause, the effect of the statements on the students involved must be considered. If the comments were harmful or potentially harmful to the children, the district's decision must be upheld. A district cannot be required to leave its students exposed to a teacher who has indicated that she is likely to engage in conduct harmful to her students. Dooley v. Fort Worth ISD, No. 106-R2-284, p. 12 (Comm. Educ., January 1985). Here, the conduct of the teacher arguably had the potential to harm her students not physically, but emotionally in regard to their development of a healthy attitude towards their own sexuality and in their future relationships with others. Although conduct by a teacher which endangers a child's physical safety is much easier to identify and **[*14]** its consequences more tangible, protecting the emotional well-being of children is no less important simply because it is more difficult to determine what harm is done and to measure its severity.

In determining whether conduct by a teacher is potentially harmful to the emotional well-being of a child, several factors must be considered. The significance of these factors is unique to the discussion of Petitioner's behavior and may be different in other cases due to the variety of community standards found in the 1100 plus school districts in Texas. Accordingly, the Commissioner must review the districts' decisions on a case by case basis.

Perhaps the most important factor to consider here is the age of the students involved, both in years and in life experiences. Petitioner's class was composed of 17-18 boys and girls who ranged in age from 11-12 years, (See Tr. Vol. 1: 119-20; Vol. 2: 15, 49, 76, 101, 124, 164, 197). These students were at an age at which many children experience the changes which occur in their bodies and emotions during puberty, and as a result, are highly sensitive and impressionable. In fact, many of the students who testified at the hearing appeared to be confused **[*15]** about the terms used during questioning and seemed offended or embarrassed by the topics which were the subject of Petitioner's classroom discussion. (See Tr. Vol. 2: 21, 55, 73, 82, 92, 108, 110-11, 113, 116, 158, 170, 206, 108, 237). At times, some of the children cried during the proceeding.

The children's age cannot be viewed alone, however. These children lived in a small rural community, more limited in their exposure to the types of experiences a child in an inner-city school in a large city might have had. Petitioner's students were likely less prepared by their life experiences to deal with her statements about the devices and techniques used by individuals engaged in sexual acts and to interpret her remarks which were made in an insensitive and flippant manner. Children of the same age in another community might not have been affected by a teacher's statements similar to those made by Petitioner; her comments might have been, in fact, common knowledge to another group.

The determination concerning what the particular students in this case knew and how they were affected is best made by those closest to the situation, most familiar with the standards and expectations of the **[*16]** community in which the children affected reside - - i.e., the local board of trustees. This is not to say that teachers are at the mercy of local school boards and without guidelines for what statements may be made in the classroom. The message that should be clear is that the teacher must exercise good professional judgment in assessing the standards of the community in which he or she

teaches when embarking on discussions of extremely sensitive subjects such as human sexuality and that guidelines, such as those given by Petitioner's principal, should not be disregarded.

Also of great importance in determining the potential for harm in Petitioner's statements is the nature and extent of her comments. Clearly, her comments were inappropriate. Petitioner's statements on a highly sensitive and controversial topic went beyond answering questions in a straightforward and textbook-like manner, or answering an occasional question inappropriately. Moreover, the potential for harm increased with the continuation of the discussion. Petitioner spent two class periods, on successive days, discussing the matter, suggesting, among other things, that her students participate in self-gratifying [*17] sexual activity, and that they search for discarded condoms. She also gave an explicit description of homosexual intercourse. (See Finding of Fact No. 6(2)(3)). The effects of the comments were magnified by her continued participation in the discussions.

Conclusion

The decision of the Rocksprings Independent School District's Board of Trustees will be affirmed, but not without reservations. Petitioner did exercise poor judgment in this matter. However, one instance of exercising poor judgment will not necessarily support an action of termination of employment. See e.g., Shivers v. Liberty ISD, No. 163-R3-682, p. 14 (Comm. Educ., Jan. 1985). In most instances, the best way to handle such matters is to advise the teacher that he or she has exercised poor judgment and that a recurrence of the objectionable conduct might result in the teacher's termination. In the present case, there is no reason to believe that a stern warning to that effect would not have effectively prevented a recurrence of the conduct.

In addition, this case is troublesome to the extent, if any, that Petitioner's termination was effected in order to placate certain irate parents. There is no evidence that any attempt [*18] was made by the school board or its administration to resolve this matter in a manner other than imposing the severe sanction of termination on Petitioner - - e.g., by holding a conference with Petitioner and those parents for the purpose of arriving at a clear understanding of what conduct would be expected of Petitioner in the future.

Nevertheless, despite these reservations, when a teacher engages in activity which is potentially harmful to her students' physical or emotional well being, a school district must be allowed to terminate that teacher's employment rather than risk the possibility that the teacher might engage in further similar conduct. This is not to say that a teacher may be terminated for participating in any harmful activity no matter how minor; the harm must be significant. But in an area as sensitive as sex education, it would be presumptuous for the Hearing Officer or the Commissioner to conclude that their judgment in determining the seriousness of the harm to the students in a particular district is better than the local school board's. The Commissioner should not, therefore, substitute his judgment for that of the local board of trustees, elected by the citizens [*19] of its community, if their determination of the significance of the harm is reasonable.

In the present case, Petitioner demonstrated that the Board's decision was questionable. She did not demonstrate, however, that it was unreasonable. The decision of the Board should, therefore, be affirmed.

Conclusions of Law

After due consideration of the record, matters officially noticed, and the foregoing Findings of Fact, in my capacity as State Commissioner of Education, I make the following Conclusions of Law:

1. Petitioner's comments on September 28 and 29, 1984 were not protected by the concept of academic freedom.

2. Petitioner's comments on September 28 and 29, 1984, constituted good cause for dismissal.

3. Petitioner's appeal should be DENIED.

After due consideration of the record, matters officially noticed, and the foregoing Findings of Fact and Conclusions of Law, in my capacity as State Commissioner of Education, it is accordingly

ORDERED that Petitioner's appeal be, and is hereby, DENIED.

SIGNED AND ENTERED this 10th day of July, 1985.

MARK ROBINETT